[Nos. 44603, 44604. En Banc. January 5, 1978.]

PARKRIDGE, ET AL, *Respondents*, v. THE CITY OF SEATTLE, ET AL, *Appellants*.

*John P. Harris, Corporation Counsel,* and *Gordon F. Crandall, Assistant,* for appellants.

*Montgomery, Purdue, Blankinship & Austin,* by *John D. Blankinship* and *Jerry W. Spoonemore,* for respondents.

*Roger M. Leed* on behalf of Capitol Hill Community Council, amicus curiae.

HICKS, J.—These two cases were consolidated for trial in the Superior Court. On appeal, the Court of Appeals continued the consolidation and certified the cases to this court.

The first case, called the "rezone case", follows from a writ of certiorari issued to review the action of the Seattle City Council in rezoning from apartment construction to single–family use eight lots and two half–lots adjacent to Volunteer Park, but separated from it by 15th Ave., E. The second case, called the "vested rights case", follows from a writ of mandate sought to require the City to issue a building permit for the construction of an apartment house on the same lots. In the "rezone case" the trial court voided the rezoning, and in the "vested rights case" the court directed the City to continue processing the building permit application promptly, diligently and in good faith. We affirm the trial court.

In 1957, the City of Seattle adopted a comprehensive plan and a new zoning ordinance. Block 29, Capitol Hill Addition (No. 4), was classified as RS 5000 (single–family, high–density, residential zone), except Lot 28, a corner lot on East Galer Street, which was zoned BN (neighborhood business). Two years later in 1959, the City rezoned Lots 15–27 of Block 29, to RM 800, a classification permitting apartment construction.

In 1963, the City engaged a planning firm to determine the best locations for high–density apartment use. In 1964, a report was submitted to the planning commission rating 12 areas in the city as suitable for high–rise apartments. Lots 15–27 were in one of those areas.

After reading the planning report, Parkridge, in 1966 and 1967, purchased Lots 17–24 and the easterly portions of Lots 15–16 with the intention of constructing an apartment house thereon. Parkridge's petition to have these lots rezoned for high–rise development was denied. Thereafter, the market for apartments softened and plans for the development of the site were postponed.

Some years later, the City ordered Parkridge to repair to code, close or demolish certain of the structures on this property. December 5, 1973, Parkridge applied to the City for a permit to demolish one of the houses covered by the City's order. Pursuant to a private arrangement, someone

in the City's building department notified a group known as the Capitol Hill Community Council or Capitol Hill Land Use Review Board of the demolition application.

December 10, 1973, the superintendent of buildings received a letter written by one who had received notification of the demolition application. The letter demanded that the City require an environmental impact statement prior to issuing the demolition permit and suggested that specific information be sought from Parkridge. Four days later the City notified Parkridge that it would require a comprehensive environmental assessment of the developer's total plans, including the information specified in the letter. Parkridge did not agree to provide an environmental assessment at that time and no demolition permit was issued.

January 4, 1974, the above-mentioned letter writer and a group of Capitol Hill residents filed a petition to rezone the Parkridge lots from apartment use to single-family residential use. Parkridge dropped its efforts to obtain a demolition permit and on February 7, 1974, applied to the City for a building permit for the construction of a 60-unit apartment building and paid the required $1,200 fee.

Following various hearings of the planning commission and the city council's committee on planning and urban development, the council acted on the rezone petition. Disregarding a recommendation from its planning commission to rezone to RM 1600 (multiple-residence, lowest density), the city council voted on June 24, 1974, to rezone in accordance with the Capitol Hill petition to RS 5000 (single-family residential use), and passed ordinance No. 103510 to that effect. The mayor signed the ordinance on June 26, 1974, and 30 days later it became effective. Parkridge responded by filing a petition for certiorari to review the action of the city council, thus beginning the "rezone case".

After examining Parkridge's application for a 60-unit apartment building, the building department's environmental section requested a "complete environmental

assessment". On April 9, 1974, Parkridge employed the planning firm of Clark, Coleman and Rupeiks, Inc., to satisfy this request. At the time of trial, $4,484.20 had been paid to this firm by Parkridge and the final billing had not yet been made.

On August 1, 1974, the building department sent Parkridge a form letter notifying it that where no action is taken on a building permit application for 6 months, the drawings submitted with the application will be destroyed 1 month after written notice to the permit applicant. In response to that letter, Parkridge's architect, Hawley Dudley, met with Walter Green, a representative of the building department. At that meeting Mr. Dudley learned of a possible change in the method of computing the square footage of a site, which in turn determines the number of units permitted under the building code. On the advice of Mr. Green, Parkridge modified its plans by reducing its building from 60 units to 50 in order to avoid a possible conflict on the appropriate measure. On August 28, 1974, Parkridge's attorney advised the building department that corrections in plans were being made and the environmental assessment adjusted accordingly. Mr. Dudley continued to meet with building department and traffic engineer personnel.

In November 1974, Mr. De–En Lang, of the planning firm employed by Parkridge, reported to the City regarding the assemblage of environmental information. Despite this fact, on December 4, 1974, the city building department advised Parkridge that under the building code the time for acting on its application had expired. On December 31, 1974, Parkridge delivered a 52–page (plus appendices) draft of an environmental impact statement to the building department.

Responding to the submission of the environmental data, the superintendent of buildings sent Parkridge a letter on January 3, 1975, listing eight reasons for refusing to proceed with the processing of the permit application. The last reason was that the site was not properly zoned to permit apartment development. After some correspondence

between Parkridge's attorney and the building department, the building department notified Parkridge on January 27, 1975, that it was standing firm and would take no further action on the building permit application.

On March 4, 1975, Parkridge sought a writ of mandate to compel the superintendent of buildings to proceed in good faith with the processing of the application for a building permit. Thus, the "vested rights case" was commenced.

 In the "rezone case", the trial court held that ordinance No. 103510 rezoning the Parkridge property was void because, (1) the decision to rezone the property was unsupported by credible evidence and was, therefore, arbitrary and capricious; (2) the rezoning of the property resulted in an inverse spot zone; (3) council members who did not attend the hearings failed to listen to tape recordings of the hearings, denying due process of law and an appearance of fairness; and (4) the City failed to comply with the State Environmental Policy Act of 1971 (SEPA). We agree that the decision to rezone was arbitrary and capricious and since that determination is dispositive of this case, we do not consider the other issues decided by the trial court. We do, however, comment below on the requirement of a verbatim record.

Because review of the action of the city council in this instance was invoked by writ of certiorari, we look to our certiorari statutes, particularly RCW 7.16.120(4) and (5), which state:

> The questions involving the merits to be determined by the court upon the hearing are:
> . . .
> (4) Whether there was any competent proof of all the facts necessary to be proved, in order to authorize the making of the determination.
> (5) If there was such proof, whether there was, upon all the evidence, such a preponderance of proof, against the existence thereof, rendered in an action in a court, triable by a jury, as would be set aside by the court, as against the weight of evidence.

In this case, the trial court determined there was no credible evidence before the city council that would support a decision to rezone the Parkridge property.

■ Without a verbatim record, it is most difficult to review the council's action in this matter. The trial court, a judge of wide and lengthy experience, was unable to find from the evidence that the rezone bore, as it must, a substantial relation to the public health, or safety, or morals, or welfare. *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 73 L. Ed. 210, 49 S. Ct. 50, 86 A.L.R. 654 (1928); *State ex rel. Modern Lumber & Millwork Co. v. MacDuff,* 161 Wash. 600, 297 P. 733 (1931). In other words, the trial court could not find from the evidence that the character of the neighborhood had so changed since 1959 that the eight or nine lots in this case should be subjected to the exercise of the City's police power. In a rezone action, adjudicatory in nature, the required relationship to the public interest is not to be presumed as it would be in an original comprehensive zoning action by the city council, which we have held to be legislative in nature. *Fleming v. Tacoma,* 81 Wn.2d 292, 502 P.2d 327 (1972). (We discuss this point further later in the opinion.) In *State ex rel. Wenatchee Congregation of Jehovah's Witnesses v. Wenatchee,* 50 Wn.2d 378, 383, 312 P.2d 195 (1957), we quoted from *State ex rel. Synod of Ohio of United Lutheran Church in America v. Joseph,* 139 Ohio St. 229, 39 N.E.2d 515 (1942) as follows:

"In determining whether respondents' administrative acts and policies may be upheld, it should be observed that the usual presumption of the validity of the acts of public boards and officials, does not apply to acts involving the forfeiture of an individual's rights or the depriving him of the free use of his property. . . . Applying this exception to a case like the one at bar, where public officials seek under a zoning ordinance to deny a landowner a particular use of his property, the highest court of Maryland has held that the board of zoning appeals has the burden of showing reasons sufficient to support its authority in refusing a building permit.

(Citations omitted.) Proof must be adduced in sufficient measure to support the rezone action and the burden of proof is on the one seeking the change. *See Fasano v. Board of County Comm'rs,* 264 Ore. 574, 507 P.2d 23 (1973).

The City contends that the evidence makes out a strong case for the rezone. The trial court found to the contrary. The evidence upon which the City relies is set forth in some 10 numbered paragraphs in its brief. We assume that this is the evidence considered by the City to be most favorable to its position.

Virtually all of this evidence came from two documents: the letter of recommendation from the Seattle Planning Commission to the city council's committee on planning and urban development and a memorandum from Council-man Miller, chairman of the urban development committee, to the other members of the city council. Whether the city council considered any of it, we have no way of knowing, absent findings of fact and conclusions.

After carefully reviewing the evidence selected by the city, we find only 3 of the 10 numbered paragraphs to be pertinent and supportive of the rezone. We set them forth below:

> 5. Since zoning to RM 800 occurred in 1959, a significant change in attitude has occurred in the surrounding neighborhood with a pride in home ownership, very much improved maintenance, and a strong community spirit being significant factors.
>
> 6. In view of the changes in the neighborhood since the rezone to RM 800 took place (1959), it is highly unlikely that the Planning Commission would, if presented with such a petition today, consider approval of such a zoning.
>
> 7. The property was rezoned from RS 5000 to RM 800 in 1959, but to date no apartment development has occurred.

A changed attitude in the neighborhood indicated by improved maintenance, pride in home ownership and a strong community spirit is an attribute commendable for the residents of any area. Perhaps as is suggested, a strong

community spirit opposed to the 1959 rezone might well have persuaded the planning commission against recommending the approval of the then proposed rezone. In any event, the original rezone of these lots in 1959 must be presumed to have followed from regular and proper procedures and we are directed to no evidence in the record which would suggest that the rezone was invalid at the time it was made.

A reference to changed attitude in the neighborhood was made in the letter from the planning commission to the council's urban development committee, but it was not further developed. We do not believe the mere assertion in the letter rises to the level of substantial evidence necessary to establish that conditions had so markedly changed in the neighborhood that a rezone was required in the public interest.

The remaining quoted paragraph indicates that there has been no apartment development since 1959 when the property was rezoned to RM 800. This statement ignores Parkridge's efforts since 1966 when it began assembling lots for the purpose of constructing an apartment building.

■ We agree that the current views of the community urging rezone to single–family use may be given substantial weight in matters of this nature. They cannot, however, be controlling absent compelling reasons requiring a rezone for the public health, safety, morals or general welfare. *See Offner Elecs., Inc. v. Gerhardt,* 398 Ill. 265, 76 N.E.2d 27 (1947).

In considering the evidence, we note that (1) there is no presumption of validity favoring the action of rezoning; (2) the proponents of the rezone have the burden of proof in demonstrating that conditions have substantially changed since the original zoning, or as in this case, the 1959 amendment thereto; and (3) the rezone must bear a substantial relationship to the public health, safety, morals or welfare. We, as did the trial court, find the evidence in this matter insufficient to support the rezone. Since the City did not carry the burden of demonstrating such a

change in this neighborhood as would justify a rezone for the public health, safety, morals or general welfare, we affirm the holding below that the rezone was void.

We also emphasize another justification mentioned by the trial court in its oral opinion. The court said, "[t]he city is required to present a verbatim record of adjudicatory zoning procedures in order to permit the parties to have a full and complete review. This was not done and it should have been done in line with the Kitsap County case." *Barrie v. Kitsap County,* 84 Wn.2d 579, 527 P.2d 1377 (1974). We agree. The writ of certiorari requires the same.

> The writ of review must command the party to whom it is directed to certify fully to the court issuing the writ, at a specified time and place, a transcript of the record and proceedings (describing or referring to them with convenient certainty), that the same may be reviewed by the court . . .

RCW 7.16.070. *See Beach v. Board of Adjustment,* 73 Wn.2d 343, 438 P.2d 617 (1968).

*Fleming v. Tacoma, supra,* distinguishes between the legislative function of enacting the initial comprehensive plan and zoning ordinance and the basically adjudicatory function of subsequent rezonings. We said at page 299:

> The process by which they are made, subsequent to the adoption of a comprehensive plan and a zoning code, is basically adjudicatory.
>
> Generally, when a municipal legislative body enacts a comprehensive plan and zoning code it acts in a policy making capacity. But in amending a zoning code, or reclassifying land thereunder, the same body, in effect, makes an adjudication between the rights sought by the proponents and those claimed by the opponents of the zoning change. The parties whose interests are affected are readily identifiable. Although important questions of public policy may permeate a zoning amendment, the decision has a far greater impact on one group of citizens than on the public generally.

In *Barrie* we expanded upon *Fleming.* After observing that a complete record is always important, we noted that "the necessity of an adequate record is especially acute

when the court is called upon to review adjudicatory proceedings." *Barrie v. Kitsap County, supra* at 586. We went on to hold at page 587 that in order to assure parties to rezone proceedings a full and complete judicial review, a verbatim record of such proceedings is required.

We reiterate the requirement of a verbatim record of rezone proceedings as mandated in *Barrie*. Henceforth, we also require, founded upon and supported by the record, that findings of fact be made and conclusions or reasons based thereon be given for the action taken by the deciding entity (in this case, the city council).

Turning now to the "vested rights case", the City contends that no vested right has been preserved because, (1) the application was inadequate to establish such a right; or (2) the application was not pursued with due diligence and any vested right obtained by filing the application had been lost. The trial court concluded otherwise.

Contra to the "rezone case" which was considered by the trial court primarily on the return and amended return to the writ of certiorari, the "vested rights case" was tried with live witnesses before the court as a conventional trial. Here, the trial court heard and saw the witnesses. The rule is that if there is substantial evidence to support the trial court's findings, we will not substitute our judgment for the court's even though, had we been the trier of fact in the first instance, our judgment might have been different. *Zillah Feed Yards, Inc. v. Carlisle*, 72 Wn.2d 240, 246, 432 P.2d 650 (1967).

This state's rule regarding the vesting of rights in cases of this kind was stated in *Hull v. Hunt*, 53 Wn.2d 125, 130, 331 P.2d 856 (1958), where we said:

[W]e prefer to have a date certain upon which the right vests to construct in accordance with the building permit. We prefer not to adopt a rule which forces the court to

search through (to quote from *State ex rel. Ogden v. Bellevue,* [45 Wn.2d 492, 275 P.2d 899 (1954)]) "the moves and countermoves of . . . parties . . . by way of passing ordinances and bringing actions for injunctions"—to which may be added the stalling or acceleration of administrative action in the issuance of permits—to find that date upon which the substantial change of position is made which finally vests the right. The more practical rule to administer, we feel, is that the right vests when the party, property owner or not, applies for his building permit, if that permit is thereafter issued. This rule, of course, assumes that the permit applied for and granted be consistent with the zoning ordinances and building codes in force at the time of application for the permit.

The application filed by Parkridge in February 1974, was consistent with the ordinances effective on that date. The City's argument is that Parkridge does not have a vested right because of the delays in processing its application. The trial court recognized that more than the filing of an application for a building permit was required under the building code to protect the applicant from a subsequent zoning change. The court made specific findings as to Parkridge's diligence in its efforts and the frustration of these efforts by the City. The City contends the findings are not supported by the record and should be rejected by this court.

We are satisfied that in the context of this case, sufficient evidence exists to support the trial court's findings. Schematic drawings indicating a 60–unit apartment building were submitted at the time of application for the permit. Over a period of 2 or more days in August, the drawings were checked and the discussion between Mr. Green of the city building department and Mr. Dudley, Parkridge's architect, took place. These events resulted in changes in design, reduction from 60 units to 50, and modification of

access between the street and the parking area. These changes were incorporated in revised drawings after discussions were held between Mr. Dudley and the traffic engineer, or members of his office. Parkridge, through its attorney, notified the City of its acceptance of the revisions and its cognizance that changes were required in drawings and assemblage of environmental data.

Mr. Dudley testified that more detailed plans of the apartment building were ready to be presented to the City in September or October. These more detailed plans were given to Mr. Rupeiks for use in completing the environmental assessment, but the letter canceling the permit application was received before Parkridge was able to deliver the plans to the City. Mr. Rupeiks testified that he and his associates had devoted 129 hours of time to environmental assessment in November and 76 hours in December. A geological soil study was started in September and completed sometime in the late fall. An acoustical engineer, who had not been available earlier, consulted with Parkridge in December and agreed to do a study on the project.

We find the above to be substantial evidence supportive of the trial court's findings that Parkridge was diligent in its efforts and that the City had frustrated those efforts. We agree with the trial court that the City should be required to process Parkridge's building permit application promptly, diligently and in good faith.

■ The State Environmental Policy Act of 1971 and the other statutes and ordinances administered by the building department serve legitimate functions, none of which is intended for use by a governmental agency to block the construction of projects, merely because they are unpopular. We make this statement in light of the history of this matter and because the building permit application will be before the building department for further processing.

The judgment of the trial court is affirmed in both cases.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.

Petition for rehearing denied March 20, 1978.