[No. 46982-2. En Banc. October 8, 1981.]

WESTSIDE HILLTOP SURVIVAL COMMITTEE, ET AL,
*Appellants,* v. KING COUNTY,
ET AL, *Respondents.*

*Roger M. Leed* and *Jeffrey M. Eustis,* for appellants.

*Norm Maleng, Prosecuting Attorney,* and *Susan R. Agid, Deputy,* for respondent King County.

*Perkins, Coie, Stone, Olsen & Williams,* by *Richard E. McCann* and *Charles C. Gordon,* for respondent Boeing Company.

HICKS, J.—On direct appeal to this court, Westside Hilltop Survival Committee (WHSC) challenges King County ordinance No. 3812 which revised the Highline Community Plan (HCP) to allow construction by Boeing of an office building on a portion of a 30–acre site previously designated as park and open space. The ordinance was upheld in the Superior Court for King County. We affirm the trial court.

There are two issues presented:

1. Was the action of the King County Council in amending the HCP through ordinance No. 3812 arbitrary or capricious?

2. Does the appearance of fairness apply to the amendment process?

The Boeing Company desires to construct a corporate headquarters building and heliport on 30 acres of Port of Seattle land west of the Seattle–Tacoma International Airport (Sea–Tac). The Port of Seattle owns the land and Boeing has an option. WHSC opposes the development as proposed.

Sea–Tac commenced operation in the late 40's. Almost immediately the airport began growing in the volume of its business. As its activity increased, it ultimately needed more area and it expanded to the west. As Sea–Tac increased in size and activity, conflict arose between neighboring residents and the Port of Seattle, owner of the airport. For a decade or more land use controversy has existed between the Port of Seattle and persons residing and owning property west of Sea–Tac. WHSC is an association of many of those persons. Individually named appellants are

members of WHSC.

The King County Council is the general governing body that establishes land use policy and regulations in King County. The Port of Seattle, an independent municipal corporation, has complete land use jurisdiction of its airport land only as long as it utilizes it for airport or airport related purposes. A headquarters building such as the Boeing Company proposes to build is a nonairport purpose; therefore King County has jurisdiction and not the Port.

December 19, 1977, the King County Council adopted the HCP. It augments King County's Comprehensive Plan and provides the land use guidelines for future development in its area. The prospective Boeing site is designated as open space in the HCP. When the HCP was adopted, the King County Council was cognizant of the Boeing Company's proposal to construct a headquarters building on Port of Seattle property, and provided as follows:

"Recognition is hereby made of the fact that the Boeing Company is proposing to construct a corporate headquarters building on the west side of the Sea–Tac Airport at a site located in a proposed buffer area on Port of Seattle Property . . .

It is further recognized that an Environmental Impact Statement with respect to such proposal is now in preparation by King County, but that no request is currently pending before King County for any land rezone or application . . . The community has not had an opportunity to publicly participate in the proposal but will be given that opportunity during the hearing process in the event an application is filed.

Accordingly, it is hereby acknowledged that the adoption of the Highline Communities Plan is without prejudice to the subsequent consideration by King County of any such request or application by or on behalf of the Boeing Company."

King County ordinance No. 3530, Statement of Fact 6.

Four days after the King County Council adopted the HCP, on December 23, 1977, Boeing and the Port of Seattle applied to King County for a rezone of the 30–acre site to allow for construction of an office structure and a heliport.

At the suggestion of the hearing examiner, no action was taken on the rezone application pending a further decision by the King County Council regarding the HCP. After the completion of an Environmental Impact Statement, the council's Planning and Communities Development Committee held a number of meetings considering the proposed plan revision. Thereafter, on July 24, 1978, a public hearing was held by the full council on the proposed modification of the HCP to make acceptable an office building on the 30–acre proposed Boeing site. At the conclusion of the public hearing, ordinance No. 3812 was adopted. This lawsuit followed.

In an apparent effort to limit expanded airport use of the west side of Sea–Tac north of South 176th Street, ordinance No. 3812 conditioned the revised HCP as follows: (1) the rest of the west side north of the proposed Boeing site remains open space, (2) any rezone approved be the most restrictive that would still permit an office building, (3) the structure itself be confined to 5 acres, (4) site plan approval and additional hearings be required, and (5) the Port adopt a resolution prohibiting certain airport uses north of South 176th Street.

Ordinance No. 3812 furthered the objective of the HCP in buffering the residential areas west of the airport. The office building is a nonairport use between the airport and the adjacent residential area. In finding No. 6 of the ordinance, the council stated:

> The proposed office use designation for a portion of the buffer with development conditions to be later applied will preserve the buffer function and will reinforce the west side residential communities.

WHSC wants ordinance No. 3812 invalidated on two grounds: (1) that it is, in effect, a rezone adopted without demonstrating either mistake or changed conditions since the HCP was initially approved; and (2) one or two council members had ex parte contacts with Boeing which WHSC argues raises an appearance of fairness issue. The two members accepted campaign contributions in excess of $700

from Boeing employees. Each actively participated in and voted for both the Boeing site reservation in the HCP and the adoption of ordinance No. 3812.

We agree with the trial court on all issues. The court held the changed condition criteria to be inapplicable in this case because in the initial stages of adopting the HCP the council deliberately deferred the question of the Boeing headquarters site for future determination following further community input. The trial court reasoned and we agree that this procedure was but a continuation of the process of adopting the comprehensive plan, that the process was legislative in nature, thus the doctrine of appearance of fairness did not apply to this process. Further, the trial court ruled that under the arbitrary or capricious standard of review, the council's legislative act was valid. On this issue we also agree.

WHSC challenges the holdings of the trial court and relies upon *Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978), for the requirement that mistake or changed conditions must be established before the HCP can be modified as was done here. Appellants reach this conclusion by citing ordinance No. 3747, adopted in 1978, as decreeing that the HCP would have the force of zoning until the adoption of area–wide zoning.

> 2. In case of conflict between the permitted use specified, if any, in the community plan and the present zoning, the community plan governs.

King County Code 20.24.165(B)(2). They argue that modifying the HCP after its adoption is equivalent to amending a zoning ordinance; it is a quasi–judicial function and to be valid must meet the *Parkridge* criteria which it did not. Appellants cite a number of Oregon cases in support of this.

Many of the Oregon cases cited by appellants are also cited in our recent case of *Barrie v. Kitsap County,* 93 Wn.2d 843, 613 P.2d 1148 (1980). *Barrie* supports the trial court's conclusion that the arbitrary or capricious standard rather than changed circumstances is the standard of review of a comprehensive plan amendment. This follows

from this court's determination that a comprehensive plan is advisory rather than regulatory. *See Buell v. Bremerton,* 80 Wn.2d 518, 495 P.2d 1358 (1972); *Lutz v. Longview,* 83 Wn.2d 566, 520 P.2d 1374 (1974); RCW 36.70.020(6), .340. Such a plan suggests regulatory measures but does not impose them and, thus, does not itself deprive the landowner of any use of his property. *Shelton v. Bellevue,* 73 Wn.2d 28, 35, 435 P.2d 949 (1968). The zoning ordinance is the regulatory measure under this state's scheme. RCW 36.70.750.

We do not believe that ordinance No. 3747 changed HCP into a zoning regulation or that it brings ordinance No. 3812 within the ambit of *Parkridge.* Rather, our view is that the language of ordinance No. 3747 "conflict between . . . the community plan and the present zoning . . ." refers to the 1967 zoning scheme still extant in the area.

We affirm the trial court's refusal to apply the appearance of fairness doctrine in this instance, on the reasoning that the matter was purely legislative. The correct standard of review for legislative action is arbitrary or capricious. Adjudicatory functions are reviewed on the appearance of fairness standard. *Fleming v. Tacoma,* 81 Wn.2d 292, 502 P.2d 327 (1972).

Determining that an action is legislative or adjudicatory is more than a matter of semantics; different consequences follow such a determination. Legislative action is far more impervious to review than is adjudication. The "arbitrary or capricious" standard which legislative actions must meet is not nearly as stringent or exacting and is difficult to prove. Adjudicatory functions must also meet the "clearly erroneous" or "substantial evidence" tests, as well as negotiate the due process hurdles of "notice", "hearing", and the "appearance of fairness". While we are unaware of any occasion where an action of Congress or a state legislature was characterized as being administrative or adjudicatory, it is common for lesser and more local legislative entities to

function on occasion in an adjudicatory or quasi–adjudicatory capacity. *See Durocher v. King County,* 80 Wn.2d 139, 492 P.2d 547 (1972).

The appearance of fairness doctrine in land use matters in this state originated in *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969). The case involved rezoning a portion of Guemes Island to permit construction and operation of an aluminum reduction plant. After summarizing arguments for and against the rezone, the *Smith* court reasoned that public hearings required by statute are an integral part of the planning and zoning process. Those hearings in which the public had a right to participate, as contrasted with merely a right to attend, must, therefore, be fairly undertaken and conducted and further, they must appear to be fair.

*Smith,* as had previous cases, categorized the rezone proceedings as "legislative" (*see, e.g., State ex rel. Myhre v. Spokane,* 70 Wn.2d 207, 422 P.2d 790 (1967)), but applied the newly formulated doctrine nonetheless. *Chrobuck v. Snohomish County,* 78 Wn.2d 858, 869, 480 P.2d 489 (1971), the follow on zoning case involving the appearance of fairness doctrine, hinted at the direction the court ultimately would take:

> Certainly, in its role as a hearing and fact–finding tribunal, the planning commission's function more nearly than not partakes of the nature of an administrative, quasi–judicial proceeding, implicit in which is the basic due process requirement that the hearing and fact–finding process must be fair and impartial.

In *Fleming,* the court in considering the action of the Tacoma City Council in a rezone matter, set the course we continue to follow:

> Generally, when a municipal legislative body enacts a comprehensive plan and zoning code it acts in a policy making capacity. But in amending a zoning code, or reclassifying land thereunder, the same body, in effect, makes an adjudication between the rights sought by the proponents and those claimed by the opponents of the zoning change. . . . Although important questions of

public policy may permeate a zoning amendment, the decision has a far greater impact on one group of citizens than on the public generally.

81 Wn.2d at 299. In *Fleming* we held the "appearance of fairness" doctrine applicable because the council was acting in an adjudicatory capacity. Subsequent cases have adhered to *Fleming*'s differentiation that adopting a comprehensive plan or zoning code is legislative action while adopting a rezone amendment is more nearly adjudicative. *See Barrie v. Kitsap County*, 84 Wn.2d 579, 527 P.2d 1377 (1974); *Leonard v. Bothell*, 87 Wn.2d 847, 557 P.2d 1306 (1976); *Parkridge v. Seattle*, 89 Wn.2d 454, 573 P.2d 359 (1978); *Hayden v. Port Townsend*, 93 Wn.2d 870, 613 P.2d 1164 (1980).

King County, under its home rule authority, has established entirely different procedures and standards for community plan adoption than for rezone decisions. A county comprehensive or community plan is adopted by ordinance following procedures used for other legislative actions, *i.e.*, prior review of the legislation by council committee and a hearing at the full council meeting. King County Code (KCC), ch. 1.24, § 20.16.020. Rezones, on the other hand, are "adjudicatory" proceedings by a hearing examiner. Like an administrative law judge, the examiner conducts the rezone hearings for receipt of evidence by documents and testimony, allows cross–examination, may issue subpoenas and otherwise conducts a full quasi–judicial proceeding. Separate chapters of the KCC deal with the hearing examiner system. KCC, ch. 21.60 and 20.24. Appeals to the council are allowed from the examiner's written report and recommendation on the rezone. KCC 20.24.190.

Here, the trial court determined the conditional adoption of the HCP and its subsequent finalization as modified by ordinance No. 3812 as part of the King County Comprehensive Plan, was one continuing legislative action. While identifiable interests are present, the finalized HCP does not, in and of itself, impact any of those interests. It is the

rezone that fills the regulatory function in contrast to the comprehensive plan which is in the nature of a blueprint and policy statement for the future. There is no rezone before us.

As to the ex parte contacts with Boeing officials and campaign contributions from Boeing employees to the two council members who sponsored and pushed for the Boeing headquarters modification, we quote from *Smith v. Skagit County, supra* at pages 740–41:

> Unlike a judicial hearing where issues of fact should be resolved from the evidence only without regard to the private views of the judges, a legislative hearing may reach a decision in part from the legislator's personal predilections or preconceptions. Indeed, the election of legislators is often based on their announced views and attitudes on public questions.

The public disclosure act, RCW 42.17, requires that contribution of funds to candidates for public office be reported to a commission where the reports are kept on file for all to examine. Thus, the public may judge whether those upon whom it confers office impartially perform the duties of the office or unduly favor those interests contributing to their campaigns.

As for ex parte contacts between the legislator and his constituents advocating specific legislation, it is an integral part of representative government at every level. It is a daily if not an hourly occurrence across the land. Absent a charge of corruption, the court should not intrude upon the legislative process. We leave to the political process the sanction, if any there be, for the conduct of either of the councilmen complained of herein.

We affirm the trial court, as it properly exercised its judicial function (*see State ex rel. Payne v. Spokane,* 17 Wn.2d 22, 134 P.2d 950 (1943)), in determining that the action of adopting the HCP and ordinance No. 3812 was continuous and legislative in nature. We also affirm the court's findings that appearance of fairness does not apply

in this case, and the actions of the council were neither arbitrary nor capricious.

BRACHTENBACH, C.J., STAFFORD, UTTER, WILLIAMS, and DIMMICK, JJ., and HAMILTON, J. Pro Tem., concur.

ROSELLINI, J. (concurring)—I agree with the majority that the zoning process was legislative in nature and that the appearance of fairness doctrine does not apply. The distinction between legislative and quasi–judicial functions is at times difficult to perceive. By pigeonholing this concept as legislative, one result follows; however, if it is quasi-judicial, the result is different.

The doctrine of the appearance of fairness is wholesome and therapeutic.

The basic concepts of the appearance of fairness are the existence of unbiased tribunals and the right to have decisions based on the evidence presented. The doctrine is constitutionally sound and has been adopted since 1898 in the case of *State ex rel. Barnard v. Board of Educ.*, 19 Wash. 8, 52 P. 317 (1898). The language of Judge Dunbar cannot be improved upon:

> The principle of impartiality, disinterestedness, and fairness on the part of the judge is as old as the history of courts; in fact, the administration of justice through the mediation of courts is based upon this principle. It is a fundamental idea, running through and pervading the whole system of judicature, and it is the popular acknowledgment of the inviolability of this principle which gives credit, or even toleration, to decrees of judicial tribunals. Actions of courts which disregard this safeguard to litigants would more appropriately be termed the administration of injustice, and their proceedings would be as shocking to our private sense of justice as they would be injurious to the public interest. The learned and observant Lord Bacon well said that the virtue of a judge is seen in making inequality equal, that he may plant his judgment as upon even ground. Caesar demanded that his wife should not only be virtuous, but beyond suspicion; and the state should not be any less exacting with its judicial officers, in whose keeping are

placed not only the financial interests, but the honor, the liberty and the lives of its citizens, and it should see to it that the scales in which the rights of the citizen are weighed should be nicely balanced, for, as was well said by Judge BRONSON in *People v. Suffolk Common Pleas,* 18 Wend. 550:

"Next in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge."

*Barnard,* at 17–18.

The United States Supreme Court has stated that the matter of procedural due process requires the appearance of fairness and fairness in fact. *Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975). Quasi–judicial administrative decisions will be reversed upon a showing of the probability or appearance of conflict or prejudgment. *Staton v. Mayes,* 552 F.2d 908 (10th Cir. 1977).

The number of cases which the courts review regarding quasi–judicial action is miniscule when compared to the number of cases on which quasi–judicial boards function. The action of a quasi–judicial board may change a marginal plan developer into a millionaire. In the public utility field, a board may grant a rate increase as high as $60 million per year. The appearance of fairness doctrine is designed to assure unbiased review. Hopefully, it prevents excessive fraternization, conflict of interest, prejudgment and improper ex parte contacts; and what is commonly known in street parlance as "pal deals".

The appearance of fairness doctrine has restored faith and credibility in the judicial process. It is a useful tool that should not be abandoned.

DOLLIVER, J. (concurring)—I agree with the opinion of the majority. My reason for writing this concurrence is to suggest that the appearance of fairness doctrine has outworn its utility and should be abandoned. Even conceding for the sake of argument that the doctrine may at one time have had some utility, that time is now past. As the major-

ity makes plain, our articulation and application of the doctrine has been neither clear nor consistent. The scope of appearance of fairness has been vague and uncertain. *See Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 557 P.2d 307 (1976); *Fleming v. Tacoma,* 81 Wn.2d 292, 502 P.2d 327 (1972). Under the best of circumstances, "appearance of fairness" is a totally subjective standard. A review of our cases since *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969), makes it apparent that our attempts at objective standards have resulted in creating distinctions which give the appearance of being more oriented toward result than fairness.

I agree with the comment of the late Justice Marshall Neill:

My objection is not to the general requirement of, and judicial concentration on, the fairness of the proceedings, but to the emphasis on appearances. . . . It requires no legal expertise to know that appearances are often misleading, a danger that is severely aggravated by modern techniques of image–making. There is the further hazard that elevation of "appearance of unfairness" to the status of a legal term of art may come to serve as a cloak for unexplained, ephemeral grounds of decision. For these reasons I believe that emphasis on appearances is a veiled and dangerous practice.

. . . [T]he court has premised judicial decision entirely on matters having no more reality than the shadows in Plato's cave.

*Chrobuck v. Snohomish County,* 78 Wn.2d 858, 875–76, 480 P.2d 489 (1971) (Neill, J., dissenting).