[No. 48030-3. En Banc. February 3, 1983.]

WALLACE HARRIS, ET AL, *Appellants,* v. MERLE R. HORNBAKER, ET AL, *Respondents.*

---

[9]Const. art. 4, § 6 (amend. 28).

*Robert Backstein* and *Evans & Kerr*, by *Leland B. Kerr*, for appellants.

*C. J. Rabideau, Prosecuting Attorney*, and *George E. Heidlebaugh, Deputy*, for respondents Hornbaker, et al.

*Leavy & Taber*, by *Andrew C. Bohrnsen* and *John G. Schultz*, for respondents Powers, et al.

BRACHTENBACH, J.—Appellants Harris, et al, appeal from a trial court's rejection of their challenge to the Franklin County Board of Commissioners' determination of where a freeway interchange should be located. We affirm.

The facts relevant to this case developed over a 10–year period. In 1970 the State Department of Transportation planned to construct a new Interstate 182 freeway through the Tri–Cities area in eastern Washington. To connect Pasco and Franklin County to this freeway system, an I–182 spur route was planned from South Richland through the "North Riverview" area of Franklin County to Pasco. See Figure 1. Two interchanges with the I–182 spur were planned in the Riverview area as part of the project: one at Road 68 and one in the vicinity of Road 100. See Figure 1. While the final decision concerning the location of the interchange rested with the State Department of Transportation (then the Department of Highways), the State agreed to give serious consideration to the recommendations of the Franklin County Board of Commissioners (hereinafter the Board). The location of the second interchange is the focus of this controversy.

The first location, proposed by appellants and others, was close to the river and described as "an extension of Road 100 . . . angling westerly connecting with Road 116 in the Road 100/116 corridor" (hereinafter referred to as the Road 116 interchange). See Figure 2. Appellants are residents and landowners in the Riverview area and areas to

FIGURE 1
Taken from Exhibit A-30
p 2

the north, northwest, and northeast of the Road 116 inter-change. They prefer the Road 116 interchange because it is close to the Columbia River, the focus of present and anticipated development. Exhibit A-32. Pursuant to appellants' proposal, the Franklin County Board of Commissioners sent a letter on May 18, 1971, to the Washington Department of Transportation requesting the Road 116 interchange.

Further action on the I–182 project occurred only sporadically over a period of years because of funding problems which ultimately caused the I–182 project to be tabled. The project was resurrected after the passage of the

654

×××× Proposed Interchange 100/116 and adjoining roads:
Supported by Appellants

– – – – Proposed Interchange 100 and adjoining roads:
Supported by Intervenors; Incorporated into
6-year road plan by Franklin County Board of
Commissioners.

FIGURE 2
Taken from Exhibit A-32

gasoline tax bill by the State Legislature in 1977. Laws of 1977, 1st Ex. Sess., ch. 317.

In early February 1978, intervenors Powers, et al, proposed another location for the interchange, an extension due north from I–182 along Road 100 (hereinafter the Road 100 interchange). See Figure 2. Intervenors are residents and landowners in the area adjacent to, or in the area of, an extension of Road 100 north. They favor the Road 100 interchange because, in part: it is a more central location for the potential development of the area both east and west of Road 100; the existing grid system for roads would be maintained and a diagonal bisection would be avoided; and the Road 100 interchange would be most direct for the overall area.

Appellants responded in favor of the previously designated Road 116 interchange because, in part: it was closer to the river and areas most likely to be developed first; it did not bisect the sand dune area; and it had been adopted by a previous board of commissioners and accepted and relied upon by many residents. Exhibit A–30.

After a number of informal meetings, the Franklin County Board of Commissioners requested the Department of Transportation to change the location from the Road 116 interchange to the Road 100 interchange. A 6–year plan was adopted by the Board in October 1978, incorporating the Road 100 interchange. See RCW 36.81.121.

Appellants challenged the Board's action in superior court. They alleged that the Board had failed to comply with the provisions of the State Environmental Policy Act of 1971 (SEPA) by failing to submit an environmental evaluation or an environmental impact statement (EIS) prior to changing the location of the interchange, and prior to the approval of the 6–year road plan. Exhibit A–32. Appellants also alleged the Board's decision to move the interchange was arbitrary and capricious, clearly erroneous, and without sufficient evidence to support the determination. Exhibit A–32.

In June 1979, a superior court judge held the Board's

action was "null and void" because there was no verbatim record or written findings to justify the Board's decision; hence the action was unreviewable. The court ruled, however, that the Board was not required to prepare an EIS of the Road 100 interchange, because its action was only in the nature of a recommendation, but stated the State might be required to do so.

Thereafter, the Board held two public hearings on August 6 and 21, 1979, to adopt a 6–year plan. The second hearing was for the sole purpose of discussing the interchange issue. Statutory notice and procedural requirements were followed for both hearings. All citizens desiring to speak at the August 21 interchange hearing were asked to sign in and state how much time they needed to speak. Additional written evidence was accepted until August 23, 1979. On August 30, 1979, the Board voted unanimously to adopt a 6–year plan including its recommendation to the Department of Transportation to locate the I–182 interchange at Road 100.

Appellants Harris, et al, appealed that decision. A superior court rejected appellants' writ of certiorari and upheld the Board's decision. The court excluded evidence on the question of prejudgment bias and held: (1) the "appearance of fairness" doctrine was inapplicable, (2) its prior holding regarding conformance with SEPA procedures was res judicata, and (3) the evidence supported the Board's recommendation of the Road 100 interchange. This appeal followed.

I

Appellants first make numerous claims about the unfairness of the public hearing on August 21, 1979. Before determining the merits of those claims we must appropriately characterize the Board's function in rendering its recommendation to the Department of Transportation.

While fairness is fundamental to any proceeding, the scope of a fairness inquiry is framed by the type of decision being made. In an adjudicatory setting, impartiality and

lack of bias are required of decision makers. *Fleming v. Tacoma*, 81 Wn.2d 292, 502 P.2d 327 (1972). This is not true in the legislative process, however.

> Unlike a judicial hearing where issues of fact should be resolved from the evidence only without regard to the private views of the judges, a legislative hearing may reach a decision in part from the legislator's personal predilections or preconceptions. Indeed, the election of legislators is often based on their announced views and attitudes on public questions.

*Smith v. Skagit Cy.*, 75 Wn.2d 715, 740–41, 453 P.2d 832 (1969). This concept limits, to an extent, the role of the courts in reviewing legislative decisions.

The rule that courts generally will not inquire into the motives of legislative officers acting in a legislative capacity is not new. *See* 1 C. Antieau, *Municipal Corporation Law* § 5.15 (1982); 5 E. McQuillin, *Municipal Corporations* § 16.90 (3d rev. ed. 1981); *Cornelius v. Seattle,* 123 Wash. 550, 213 P. 17 (1923); *Goebel v. Elliott,* 178 Wash. 444, 35 P.2d 44 (1934).

> [Municipal l]egislation is not to be nullified by the judicial branch of government unless the enactment contravenes the constitution or is manifestly unreasonable, arbitrary and capricious.

*Fleming v. Tacoma, supra* at 301 (Neill, J., concurring).

Whether a decision is legislative or adjudicatory does not necessarily depend on the type of decisionmaking body, however. Members of the judiciary may be entrusted with functions that are legislative in character, *see Concerned Citizens of S. Ohio, Inc. v. Pine Creek Conservancy Dist.,* 429 U.S. 651, 657–58, 51 L. Ed. 2d 116, 97 S. Ct. 828 (1977) (Rehnquist, J., dissenting) (judges serving to create conservancy districts act in legislative capacity), while legislative bodies may be entrusted with essentially adjudicatory tasks, *see Fleming v. Tacoma, supra* (county board's rezoning decisions deemed quasi adjudicatory). *See generally In re Juvenile Director,* 87 Wn.2d 232, 552 P.2d 163 (1976). We must look, instead, to the kind of decision being

made to determine the breadth of the fairness inquiry.

■■ Appellants would have us review this case under the appearance of fairness doctrine. This doctrine has been applied when legislators are involved in adjudicatory decisions. *Fleming v. Tacoma, supra*. Under the appearance of fairness doctrine, this court has required that the decision-making process "not only [be] fair in substance, but fair in appearance as well." *Smith v. Skagit Cy., supra* at 739. The purpose and scope of the doctrine was explained in *Chrobuck v. Snohomish Cy.*, 78 Wn.2d 858, 868, 480 P.2d 489 (1971):

> [T]he evil sought to be remedied lies not only in the elimination of actual bias, prejudice, improper influence or favoritism, but also in the curbing of conditions which, by their very existence, tend to create suspicion, generate misinterpretation, and cast a pall of partiality, impropriety, conflict of interest or prejudgment over the proceedings to which they relate.

The intent of the doctrine is to maintain public confidence in quasi–judicial decisions made by legislative bodies. *Westside Hilltop Survival Comm. v. King Cy.*, 96 Wn.2d 171, 181, 634 P.2d 862 (1981) (Rosellini, J., concurring).

This case, however, does not implicate the appearance of fairness doctrine.[1] The determination of where to place a road has traditionally been a distinctly legislative decision. RCW 36.75.140; *State ex rel. Schroeder v. Superior Court*, 29 Wash. 1, 69 P. 366 (1902). The statutory responsibility for developing a 6–year plan vests in the Board as a "legislative authority". RCW 36.81.121. Moreover, the appearance of fairness doctrine has never applied to such

---

[1] Recently, the appearance of fairness doctrine has been harshly criticized. *See* Alkire, *Washington's Super–Zoning Commission*, 14 Gonz. L. Rev. 559 (1979); Vache, *Appearance of Fairness: Doctrine or Delusion?*, 13 Willamette L.J. 479 (1977); Comment, *Public Hearings—An Appearance of Fairness*, 5 Gonz. L. Rev. 324 (1970). While we perceive the need for review and clarification of the doctrine's scope, *see, e.g., Fleck v. King Cy.*, 16 Wn. App. 668, 558 P.2d 254 (1977), we refrain from addressing the issue here as it is not necessary for a determination of this case. *See Johnson v. Morris*, 87 Wn.2d 922, 931, 557 P.2d 1299 (1976); 21 C.J.S. *Courts* § 182 (1940).

legislative decisions.[2] *See Fleming v. Tacoma, supra* at 297; *see also* Laws of 1982, ch. 229. We hold, therefore, that the issue of where to locate a highway interchange is a legislative decision and the appearance of fairness doctrine does not apply.

■ Appellants argue that the placement of the interchange is an adjudicatory decision because there are two readily identifiable competing interest groups here. The adversarial character of the public hearing was incidental, however, to its purpose. The purpose of the public hearing was to provide a forum for public participation, not to frame the debate for two self-appointed litigants. The Board's responsibility was not to decide which of the two groups (appellants or intervenors) made the best argument; its task was to decide which interchange location was in the best interest of the county. If its decision were not arbitrary or capricious, the Board could have chosen a location proffered by neither of the competing interest groups. Posing the problem in an adversarial manner does not change the essentially legislative character of the decision.

All policy decisions are the result of balancing the entirety of discrete individual rights in the community. It is not surprising that two groups may make a legislative decision appear adjudicatory by focusing the decision makers on how the decision will affect their individual rights. This does not make the decisions adjudicatory, however. *See* Robinson, *The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform*, 118 U. Pa. L. Rev. 485, 504 (1970).

Appellants also argue that the statutory requirement of

---

[2]In *Smith v. Skagit Cy.*, 75 Wn.2d 715, 453 P.2d 832 (1969), the first case to enunciate the appearance of fairness doctrine, the rezoning decision was referred to as a legislative act. Subsequent cases clarifying the applicability of the doctrine, however, have recognized that the rezoning of specific tracts is adjudicatory in nature, not legislative. *See Fleming v. Tacoma, supra* at 301 (Neill, J., concurring); *Save a Valuable Env't v. Bothell*, 89 Wn.2d 862, 576 P.2d 401 (1978). Thus, the statement in *Smith* is explained by the fact that the case preceded the adoption of the term quasi judicial to identify adjudicatory decisions by legislative bodies; it does not reflect an application of the doctrine to legislative decisions.

"one or more public hearings" as a precondition to adopting a 6-year road plan, RCW 36.81.121, renders the Board's decision quasi judicial. While a public hearing is a requirement for an adjudicatory decision by legislative body, all statutory public hearings do not involve quasi–judicial decisions. For example, the adoption of a comprehensive zoning plan involves statutory public hearings, RCW 36.70-.380, but the decisionmaking body nevertheless acts in a legislative, "policy making capacity." *Fleming v. Tacoma, supra* at 299.

A statutory public hearing by a legislative body is not the talisman for invoking the appearance of fairness doctrine. If it were, we would unfairly constrain the Legislature in its attempt to provide opportunities for public participation in legislative decisions. If by requiring a public hearing the Legislature would implicitly force its subdivisions to adhere to a full panoply of adjudicatory safeguards, it might well decide to eliminate such hearings altogether. Prior cases should not be interpreted as indicating that a decision becomes quasi judicial and triggers the appearance of fairness doctrine by the mere fact that a hearing is required by statute. *See Polygon Corp. v. Seattle,* 90 Wn.2d 59, 67–68, 578 P.2d 1309 (1978).

## II

■ Having concluded the Board's decision is legislative, we are not relieved from examining the fairness of the legislative decisionmaking process, but our inquiry is limited. As we stated in *Fleming v. Tacoma,* 81 Wn.2d 292, 297, 502 P.2d 327 (1972):

> [W]e have refrained from such an examination [of the motives] of legislative bodies, *i.e.,* boards of county commissioners or city councils, when acting pursuant to statutes regulating zoning. We have held that while so acting they are exercising legislative powers and therefore we will not, in the absence of fraud, inquire into the motives of their members.

A court may overturn an exercise of legislative authority only for manifest abuse of discretion, such as arbitrary or

capricious conduct. *Duckworth v. Bonney Lk.*, 91 Wn.2d 19, 586 P.2d 860 (1978); *Buell v. Bremerton*, 80 Wn.2d 518, 495 P.2d 1358 (1972). Given this framework, we now address appellants' fairness claims.

Appellants first claimed the trial court erred in refusing to admit evidence concerning the prejudgment bias of certain county commissioners. As we stated above, such a predisposition is an inherent part of the political process. Appellants' recourse is through the electoral process, not judicial review of the motives of one acting in a legislative capacity. The trial court committed no error.

Appellants also claim the hearings were procedurally unfair because the County allegedly failed to adequately define the issues in providing notice of the hearings. The record discloses, however, that all statutory notice requirements were followed. The notice advised the public that the meeting was to "hear specifically the Road 100 question". While it did not specifically mention the Road 116 location, given the history of this dispute, the notice was undoubtedly adequate to serve its purpose. The transcript of the hearing illustrates that those attending were not in any way misled by the terminology in the notice. Thus, this fairness objection is without merit.

Next, appellants claim they were denied the right of cross examination and rebuttal. As to the cross examination claim, appellants rely on *Chrobuck v. Snohomish Cy.*, 78 Wn.2d 858, 480 P.2d 489 (1971) in which the court permitted cross examination in a rezoning context. While this case is ostensibly similar to *Chrobuck* in that counsel were present at the hearing and expert reports were given regarding technical matters, it is materially different because the decision in *Chrobuck was quasi judicial. See Fleming v. Tacoma, supra.* Here, the decision was legislative. There is no inherent right to cross–examine at a legislative hearing, and there is no precedent for granting participants such a right. Thus, the Board properly denied appellants' request.

On the rebuttal issue, appellants claim the Board's time

restriction on submitting additional evidence to only 2 days after the hearing denied them adequate opportunity for rebuttal. While this period was admittedly short, the issues had been framed for some time. In addition, the Board had to render its recommendation to the Department of Transportation in order to save the entire project. Under these circumstances, the time limit was not unreasonable.

Finally, appellants claim the Board manipulated the order of presentation of the evidence to deny them due process. Even assuming, arguendo, their claims were true, appellants had no right to a particular order of presentation. The Board's actions at the hearing were reasonable. All citizens desiring to speak were given an opportunity to do so, and no time constraints were imposed. Moreover, the record does not indicate an attempt by the Board to circumvent the fair presentation of evidence.

To summarize, given the nature of the decision made, the public hearing held on August 21, 1979, was conducted fairly. The commissioners followed reasonable procedures and admitted all relevant evidence. To the extent any commissioners were predisposed to decide one way or the other, they did not impose their point of view upon the public hearing. The predisposition of the commissioners, if any, is not a demonstration of unfairness in this context. The political process involves elected officials taking positions on policy decisions they will face. Appellants' fairness claims are without merit.

### III

Appellants also claim the Board failed to comply with SEPA procedures by failing to "complete an environmental check list, make a threshold determination, or determination of lead agency prior to its act in changing the location of the interchange". Reply Brief of Appellants, at 8. This argument is without merit.

RCW 43.21C.030(2)(c) requires "all branches of government of this state" to include an EIS for "every recommendation or report on proposals for legislation and other

major actions significantly affecting the quality of the environment". However, WAC 197–10–200 states the "lead agency shall be the only agency responsible for complying with the threshold determination procedures . . .", and the lead agency shall be responsible for the draft and final EIS. The history of this project indicates the Department of Transportation, not the Franklin County Board, is the lead agency and therefore "responsible" for further action under SEPA if it should be necessitated.

In 1979, the Superior Court held that the Franklin County Board of Commissioners was not required to prepare an EIS in support of its recommendation of the Road 100 interchange on the grounds that the I–182 highway system was a project of the State Department of Transportation. This decision was not appealed. In 1980, the Superior Court ruled its prior decision was res judicata on the issue of the County's duty to comply with SEPA. We agree. *See Seattle–First Nat'l Bank v. Kawachi,* 91 Wn.2d 223, 588 P.2d 725 (1978).

The trial court's ruling that the County need not prepare an EIS for the interchange does nothing to relieve the Department of Transportation of its duties as the lead agency, however. The location of the interchange has changed and years have passed since the final EIS for the Road 100/116 corridor was completed. Therefore it is incumbent upon the Department of Transportation to determine if a supplemental EIS pursuant to WAC 197–10–495 or WAC 197–10–695 is required, or if the existing final EIS may be used for the County's new recommendation pursuant to WAC 197–10–660.

██ Contrary to appellants' assertion, the County's approval of the 6–year road plan does not require compliance with SEPA. The 6–year road plan provides perpetual advanced plans for a coordinated road program. RCW 36.81.121. The plan establishes guidelines, but it may be revised at any time, provided a public hearing is held. RCW 36.81.121. Like a comprehensive zoning plan, it is advisory rather than regulatory. *See Westside Hilltop Survival*

*Comm. v. King Cy.,* 96 Wn.2d 171, 634 P.2d 862 (1981). It is not a proposal for an *action* affecting the environment. *See* RCW 43.21C.030(2)(c).

## IV

Finally, appellants claim that under the standard of judicial review for writs of certiorari, RCW 7.16.120(5), the Board's decision to recommend the Road 100 intersection is not supported "by a preponderance of . . . competent proof". Brief of Appellants, at 27.

Since we have concluded the Board's decision is legislative, review of the Board's action under RCW 7.16.120 is inappropriate. Only upon showing of lack of jurisdiction, failure to adhere to procedural requirements, or action arbitrary, capricious or contrary to law should the presumption of legislative validity be defeated. *See Williams v. Seattle Sch. Dist. 1,* 97 Wn.2d 215, 643 P.2d 426 (1982); *Selde v. Lincoln Cy.,* 25 Wash. 198, 65 P. 192 (1901). None of these circumstances is indicated here.

We affirm the trial court in all respects.

WILLIAMS, C.J., and ROSELLINI, STAFFORD, DORE, DIMMICK, and PEARSON, JJ., concur.

UTTER, J. (concurring)—I do not disagree with the result reached by the majority but would take this occasion to disavow our so-called appearance of fairness doctrine.

The majority recognizes that fairness is fundamental to any proceeding, requiring impartiality and lack of bias of all decision makers in an adjudicatory situation. It also rejects, as it must, our previous rationale that the appearance of fairness doctrine is triggered by the fact that a hearing is required by statute. (See majority, at 660.)

Our cases reveal two primary components of the appearance of fairness doctrine. We have first imposed certain procedural protections typical of adjudicatory proceedings, *see Smith v. Skagit Cy.,* 75 Wn.2d 715, 453 P.2d 832 (1969) such as cross examination, *Chrobuck v. Snohomish Cy.,* 78 Wn.2d 858, 480 P.2d 489 (1971), findings of fact and con-

clusions, *Parkridge v. Seattle,* 89 Wn.2d 454, 464, 573 P.2d 359 (1978), and verbatim transcripts, *Barrie v. Kitsap Cy.,* 84 Wn.2d 579, 587, 527 P.2d 1377 (1974), to accompany the statutorily required public hearing. We have also required those who support a rezone to carry the burden of proof. *Parkridge,* at 461. Second, we have permitted inquiry into the motives and interests of the decision maker. Just as we, as judges, are subject to certain per se rules of disqualification for such things as financial interest and prejudgment bias, *see* Code of Judicial Conduct, Canon 3(C), we have imposed similar constraints in rezoning decisions that were deemed essentially adjudicatory. Cases in which we have invoked the doctrine because of the financial interest of the decision maker are: *Save a Valuable Env't v. Bothell,* 89 Wn.2d 862, 576 P.2d 401 (1978); *Swift v. Island Cy.,* 87 Wn.2d 348, 552 P.2d 175 (1976); *Narrowsview Preserv. Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974); *Fleming v. Tacoma,* 81 Wn.2d 292, 502 P.2d 327 (1972); *Buell v. Bremerton,* 80 Wn.2d 518, 495 P.2d 1358 (1972); *Chrobuck. See also Byers v. Board of Clallam Cy. Comm'rs,* 84 Wn.2d 796, 529 P.2d 823 (1974) (financial interest too attenuated to establish violation of doctrine). Cases in which prejudgment bias was demonstrated are: *Swift; Anderson v. Island Cy.,* 81 Wn.2d 312, 501 P.2d 594 (1972). *But see Fleck v. King Cy.,* 16 Wn. App. 668, 558 P.2d 254 (1977) (disqualification because board members were married without showing of prejudgment bias).

Analogy to the Code of Judicial Conduct is an important guide and *limitation* on the scope of the appearance of fairness doctrine. A judge should disqualify him or herself when his or her "impartiality might reasonably be questioned", CJC 3(C)(1), where he or she "*has a personal bias or prejudice* concerning a party", CJC 3(C)(1)(a), or if the judge knows he or she has a financial or other interest that "could be substantially affected by the outcome of the proceeding", CJC 3(C)(1)(c). (Italics mine.) A judge must *actually* be biased and *actually* have a financial interest for impartiality to be reasonably questioned. Judges, however

regrettable may be the truth, are not completely insulated from the world. Each judge brings to the bench his or her personality and philosophical disposition toward the world. If objectivity requires more, certainly that is not what we seek in judges. "Proof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." *Laird v. Tatum,* 409 U.S. 824, 835, 34 L. Ed. 2d 50, 93 S. Ct. 7 (1972) (memorandum of Rehnquist, J.).

While a judge may be capable of rendering a fair determination even though he or she has a personal bias or financial interest, we require disqualification to ensure fairness. At the same time, "a party's unilateral perception of an appearance of bias cannot be a ground for disqualification unless we are ready to tolerate a system in which disgruntled or dilatory litigants can wreak havoc with the orderly administration of dispute–resolving tribunals." *Andrews v. Agricultural Labor Relations Bd.,* 28 Cal. 3d 781, 792, 623 P.2d 151, 171 Cal. Rptr. 590 (1981). We must presume that judges are capable of finding adjudicative facts fairly while ignoring incidental influences. If such a presumption cannot be made, the administration of justice is not possible.

In characterizing rezoning and other localized land use decisions as quasi adjudicatory, we have imposed constraints on decision makers in that context similar to those we would impose on judges.[3] Concern for fairness should not impose more or less constraints on legislative bodies rendering quasi–adjudicatory decisions.[4]

---

[3]Of course, judges are also subject to challenges based on affidavits claiming prejudice which need not show actual bias. RCW 4.12.050. This limited statutory privilege, which a litigant may exercise only once in a proceeding, is extended to litigants in judicial proceedings where more than one judge is available. Such a safeguard should not be imposed on legislative bodies rendering quasi–judicial decisions. The doctrine of necessity, if nothing else, dictates legislative bodies cannot be made the subject of such preemptive challenges.

[4]Viewing the appearance of fairness doctrine in this light, some of the incon-

While I agree with the fairness elements of which our doctrine is comprised, these elements indicate the doctrine's title is misleading. We have used the doctrine to impose procedural protections upon quasi–judicial proceedings of legislative bodies and to make such decision makers subject to the laws of prejudgment bias and pecuniary interest. These requirements are fundamental to the fairness needed for such individualized proceedings. Meeting these requirements establishes *fairness,* and we need not clothe them in the vague language of the "appearance of fairness".[5] To the extent the doctrine has been used to

---

sistencies in our application of the doctrine can be made more understandable. In *King Cy. Water Dist. 54 v. King Cy. Boundary Review Bd.,* 87 Wn.2d 536, 554 P.2d 1060 (1976) we assumed the appearance of fairness doctrine applied to boundary review board proceedings. The board is a manifestation of the Legislature's control over its subdivisions and its functions are administrative. The Legislature has provided elaborate procedural protections for this administrative process, and review of the board's decision was guided under the terms of the statute. RCW 36.93.100, .160. In that context, there was no need to invoke the "appearance of fairness" doctrine to provide the necessary process to be afforded in a legislative context that we consider quasi–judicial. The statute itself made the board's decision quasi–judicial, and provided a comprehensive method of review, which comported with administrative due process. To the extent *Bellevue v. King Cy. Boundary Review Bd.,* 90 Wn.2d 856, 586 P.2d 470 (1978) indicates otherwise, I would change it. The fairness inquiry in that case might well have been appropriate, but the invocation of the "appearance of fairness" was unnecessary where the statute provided the terms of administrative due process.

In *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 578 P.2d 1309 (1978) we held the appearance of fairness doctrine was inapplicable to administrative decisions such as those involving building permit applications. The court held actual partiality was a relevant basis for reversal. As stated here, actual partiality *is* the basis for reversal under the principles of fairness that apply to quasi–judicial decisions of legislative bodies such as those concerning building permit applications.

Finally, while administrative due process must surely be accorded individuals subject to administrative adjudications such as that reviewed in *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 557 P.2d 307 (1976), our fairness inquiry here has been wrought in a different context and is only helpful by way of analogy to an understanding of administrative due process. *See State ex rel. Beam v. Fulwiler,* 76 Wn.2d 313, 456 P.2d 322 (1969).

[5]This is not to say "fairness" does not include an implicit concern for the "appearance of fairness." By securing procedural safeguards for quasi–judicial decisions such as cross examination, a verbatim transcript, and a ban on improper ex parte contacts, we do not say that without such safeguards the result would

afford a speculative and conjectural fairness inquiry that extends beyond these requirements, I would disapprove of it. *See Fleck.* Such speculation has led to our own doubts about the jurisprudential basis of the doctrine, *see Bellevue v. King Cy. Boundary Review Bd.,* 90 Wn.2d 856, 586 P.2d 470 (1978) (wherein the court in dicta stated the appearance of fairness doctrine is not constitutionally based) and to a general misunderstanding about the doctrine's scope.

The factors previously discussed define *fairness* and the *due process* that must be afforded those subject to quasi–judicial individualized land use decisions of legislative bodies. By abandoning the caption "appearance of fairness", this court could establish a fairness inquiry that is rooted jurisprudentially, is a tool to be used by litigants, the court and legislative bodies, and which provides certainty where there has been little in the past. By calling our inquiry "fairness", we remove the confusion inherent with the "appearance of fairness" doctrine.

DOLLIVER and DIMMICK, JJ., concur with UTTER, J.

---

necessarily be unfair. These safeguards simply insure the best possibility of a fair result. The same is true of a decision maker with financial interest. We cannot say that such a person is incapable of rendering a fair decision, but by requiring his or her disqualification we provide the best possibility that a fair result will ensue. Fairness in quasi–judicial decisions always includes a concern for the appearance of fairness, but it does not include speculative claims of injustice which we as judges would not countenance with respect to our own judicial proceedings.