CITIES & VILLAGES OF ALGOMA, EAGLE RIVER, NEW HOL-
STEIN, STRATFORD, STURGEON BAY & TWO RIVERS,
Respondents, v. PUBLIC SERVICE COMMISSION OF
WISCONSIN, Appellant.

Court of Appeals

*No. 77–651.  Argued September 8, 1978.—
Decided December 29, 1978.*
(Also reported in 283 N.W.2d 261.)

254

For the appellant there were briefs by *Bronson C. La Follette,* attorney general, *Steven M. Schur,* chief counsel, and *Thomas A. Lockyear,* assistant chief counsel, and oral argument by *Thomas A. Lockyear.*

For the respondents there was a brief by *Richard L. Olson, J. Leroy Thilly* and *Boardman, Suhr, Curry & Field,* of Madison, and oral argument by *Richard L. Olson.*

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

GARTZKE, P.J.   The Public Service Commission of Wisconsin (PSC) has appealed from a judgment entered

by the circuit court for Dane County remanding to the PSC for further proceedings the PSC's determinations that each of the six respondent cities[1] shall credit to its retail electric power customers a rate refund each respondent received. We affirm.

The cities operate municipal electric utilities and sell electric power at retail to their residents. The cities do not own generating facilities. They buy power at wholesale from Wisconsin Public Service Corporation (WPS) and distribute that power at retail. The rates the cities pay for wholesale power are regulated by the Federal Energy Regulatory Commission, formerly the Federal Power Commission (FPC).[2] During the period involved in this case, the FPC was still in existence.

The FPC may authorize a wholesaler to put a proposed rate increase into effect before it is finally approved by the FPC, subject to the obligation of the wholesaler to refund to its customers (such as the cities) the difference between charges based on the proposed rate and the reasonable rate as finally determined by the FPC. This procedure is authorized by 16 U.S.C. sec. 824d. The dispute before this court concerns the ultimate disposition of such refunds by WPS to the cities.

The cities[3] filed applications with the PSC in 1973 to increase rates so as to pass on to their retail customers

[1] The cities and villages of Algoma, Eagle River, New Holstein, Stratford, Sturgeon Bay and Two Rivers, referred to as the "cities."

[2] The FPC was abolished and replaced by the Federal Energy Regulatory Commission on October 1, 1977. Department of Energy Organization Act, Public Law 95–91, 91 Stat. 565 (August 4, 1977) and Executive Order No. 12009, 42 Fed. Reg. 46267 (September 15, 1977). The law providing for federal regulation of wholesale electric rates, the Federal Power Act, 16 U.S.C. §824 *et seq.*, however, was not altered by this change.

[3] Except Stratford which did not file until June 13, 1974 and therefore did not obtain the interim order described in this para-

the additional cost resulting from an immediate wholesale rate increase which the FPC authorized WPS to charge in FPC Docket E–8157. Purchased power costs are 75% to 85% of the cities' total costs in serving their retail customers. Immediate relief in the form of a final order by the PSC is not possible[4] and some type of interim relief was necessary. The PSC accordingly entered "interim orders" authorizing each city to apply a surcharge to its electric service rates and retaining jurisdiction to set final rates until after a final determination by the FPC of WPS's wholesale rates in FPC Docket E–8157.

The FPC made its final determination of WPS's wholesale rates in Docket E–8157 April 30, 1974. June 24, 1974, while the cities applications, filed as a result of Docket E–8157, were still pending before the PSC, WPS made a second application to the FPC in Docket E–8867 to increase further its wholesale rates. The cities intervened in Docket E–8867. The FPC authorized WPS to apply the new wholesale rates sought in Docket E–8867 effective August 27, 1974, until determination of the final wholesale rates, subject to the obligation to make refunds.

The PSC, after public hearings in the fall of 1974, entered interim orders as a result of the second application of WPS in Docket E–8867 authorizing each city to substitute specified interim rates for its existing rates plus a surcharge pursuant to a "purchased power adjustment clause" (PPAC) to adjust the total charge for electric service to reflect the change in the wholesale rate under which it purchased power. The adjustment was

graph. Stratford did receive an interim order comparable to that set forth in footnote 5.

[4] The problem of the lag in time between a utility's application for a rate change and final action thereon by the regulatory agency—known as "regulatory lag"—can be a severe one. *Friends of Earth v. Public Service Commission*, 78 Wis.2d 388, 402, 254 N.W.2d 299 (1977).

calculated according to a prescribed mathematical formula and added to each customer's monthly bill. Each order provided that upon final FPC approval of the wholesale rates of WPS in its second application in Docket E–8867, the PSC would have 90 days in which to determine whether the city had made "excessive earnings." In the event of such a determination by the PSC, each order provided that the city "may subsequently be ordered to make a refund to any of its customers through a procedure approved by this commission."[5]

[5] The interim order issued to the City of Two Rivers Docket 2–U–7742, dated September 18, 1974, is typical:

[Findings of Fact]

On June 24, 1974, Wisconsin Public Service Corporation made a second application to the Federal Power Commission in Docket E–8867 for authority to further increase its wholesale rates. The Federal Power Commission has authorized the Wisconsin Public Service Corporation to apply these proposed wholesale rates under bond, effective August 27, 1974, until determination of the final wholesale rates is made by the Federal Power Commission. The ultimate impact on Applicant's purchased power expense will not be known until a final decision on the wholesale rates is made by the Federal Power Commission. *Should the final disposition of the wholesale rates of Wisconsin Public Service Corporation, authorized by the Federal Power Commission in Docket E–8867, result in excessive earnings for the Applicant, refunds will be ordered by the Public Service Commission of Wisconsin.* Adequate records shall be retained by the Applicant as prescribed in this Commission order to make such refunds possible should they ultimately occur. Applicant's *earnings* are extremely sensitive to changes in the wholesale rates charged by its supplier since these purchased power costs represent approximately 75% of total operating expenses. To prevent future extreme fluctuations of Applicant's *earnings* resulting from changes in purchased power costs which may be due to changes in the wholesale rate of Wisconsin Public Service Corporation and/or adjustments in the fuel clause of existing wholesale rates of said supplier, it is reasonable and just to apply an adjustment clause to all retail bills rendered by Applicant. Such adjustment clause is ordered herein.

Applicant has requested a 7% return on net investment rate base citing, among other things, alternative investment opportuni-

A settlement was reached between the cities and WPS in October, 1975, which reduced the wholesale rate increase requested in WPS's second application in Docket E-8867. FPC approved the settlement, which resulted in an FPC order December 9, 1975, requiring WPS to refund to the cities a total of $405,907, ranging from $56,126 for Algoma to $117,791 for Two Rivers. WPS made the refunds in January, 1976.

July 12, 1976, the PSC advised each city by letter that the PSC had, on the basis of a "recent examination of your records by the Commission staff determined that the refund, adjusted as follows, should be credited to your retail customers on a per Kwh. basis over a six month period." A computation followed, consisting of the refund the city received plus interest on the refund, an ad-

ties under current economic conditions and the inadequacy of cash flow with a 6% return to provide for both debt service and funds for plant additions. The adequacy of the return earned by a municipal electric utility is measured generally by the cost of borrowed funds, the inherent risks of the enterprise and the need to maintain the financial integrity of the utility. Applying these criteria, a 6% rate of return is reasonable and just. The authorized rates will increase annual revenues by $149,424, which will result in an estimated reasonable and just net operating income of $121,787 for the test year. Such net operating income represents a rate of return of 6% on the above determined rate base of $2,026,189.

[Order]

3. That upon final approval of the wholesale rates of Wisconsin Public Service Corporation by the Federal Power Commission in Federal Power Commission Docket E-8867, *this Commission shall have 90 days in which to determine whether or not Applicant has made excessive earnings.*

4. That as a condition to the acceptance of the interim monthly rates authorized herein, the City of Two Rivers, Manitowoc County, as an electric public utility, shall keep accurate and detailed records of all billings under the monthly rates prescribed herein. *If during the 90-day period, it is determined that Applicant has made excessive earnings, said company may subsequently be ordered to make a refund to any of its customers through a procedure approved by this Commission.* (Emphasis added.)

justment to correct for overbilling or underbilling and the net amount to be credited to retail customers. The PSC made its letter determinations without notice to the cities and without holding further hearings.

Well before the PSC issued its July 12, 1976, letter refund determinations, it made additional findings in the pending 1973 applications of three of the cities, Algoma, New Holstein and Sturgeon Bay:

*Algoma,* August 5, 1975—"Annualizing the rates authorized on September 18, 1974, for the entire year ending December 31, 1974, excluding revenues collected from the Power Cost Adjustment Clause, and also annualizing the proposed wholesale settlement rates for this same period, results in a pro forma net loss of $96,790 for the test year. *Existing rates are therefore unreasonable and unjust because they are inadequate.*" (Emphasis added.)

*New Holstein,* November 17, 1975—"As the above income statement indicates, for the year ended December 31, 1974, Applicant's net operating income was $22,167, which is a 2.47% rate of return on net investment rate base of $897,528. Based on projected revenues (from base rates only) and expenditures it is projected that Applicant will experience a pro forma net loss of $266,595 for the test year ending December 31, 1975. *Existing rates are therefore unreasonable and unjust because they are inadequate.*" (Emphasis added.)

*Sturgeon Bay,* June 13, 1975—"Annualizing the rates authorized on September 20, 1974, for the entire year ending December 31, 1974, excluding revenues collected from the Power Cost Adjustment Clause, and also annualizing the proposed wholesale settlement rates for the same period, results in a pro forma net loss of $126,089 for the test year. *Existing rates are therefore unreasonable and unjust because they are inadequate.*" (Emphasis added.)

September 1, 1977, the PSC found in another application filed by Two Rivers January 27, 1976, but on the basis of its interim order authorizing a surcharge because of FPC Docket E–8867,

"During the pro forma test year ending December 31, 1977, applicant is expected to purchase 62,580,000 kilowatt-hours of electricity (with a line loss of 6.2%) at a cost of $1,549,779, from its wholesale supplier Wisconsin Public Service Corporation. Applicant's present rates are expected to produce total operating revenues of $2,037,800 against total operating expenses of $2,048,129, yielding net operating loss of $10,329. *Existing rates are unreasonable and unjust because they are inadequate.*" (Emphasis added.)

The cities jointly applied to the PSC for reconsideration and rehearing of the letter refund determinations on grounds that the PSC had not found that the cities had "excessive earnings" during the period in which they made the PPAC surcharges. They argued that the letter determinations were inconsistent with a 1972 order[6] applying the term "excessive return" which permitted Eagle River to retain a refund it received from WPS because of a retroactive adjustment by the FPC of a wholesale rate. The PSC found in the 1972 order,

"The estimated income statement [of Eagle River] for 1972 presented above is based on the cost of purchased energy under the final rate and since applicant would suffer an operating loss on this basis it is apparent that no excessive return resulted from receipt of the refund."

The cities also requested a hearing to enable them to present evidence as to the effect of the refunds upon their earnings, to show errors in calculation of the refunds and to show alternatives to the determinations. The PSC denied the application for reconsideration and rehearing and the cities petitioned the circuit court for review.

The circuit court construed the cities' application for reconsideration and rehearing as an application for retroactive adjustment of their rates in effect during the period for which WPS made its refunds. The court read

---

[6] City of Eagle River, PSC Docket No. 2–U–7471.

sec. 196.645, Stats., to permit a retroactive rate increase. It found that the PSC's findings as to Algoma, New Holstein, Sturgeon Bay and Two Rivers in 1975 and 1977 established that each of those cities had inadequate earnings for all or most of the period covered by the WPS refunds and that retention of at least part of such refunds would not result in excessive earnings. The court concluded that the refund determinations by the PSC in its July 12, 1976, letters should be reversed and remanded the matter to the PSC, noting that a public hearing would be necessary because the refund applications of the cities, if granted, would result in rate increases for their retail customers.[7]

It is the cities' position that they should credit to their retail customers the refunds received from WPS less: (1) amounts not actually collected from retail customers due to failures of the PPACs; (2) the cities' costs in effecting the settlement resulting in refunds through intervention in WPS's second application, Docket E–8867; and (3) the amount needed to bring each city's return on equity up to the level authorized by the PSC (said to be usually 6%) for the refund period.

The PSC contends that the PPACs authorized by the interim order were intended solely to protect each city against the wholesale power cost increase by "passing through" the cost increase to retail customers. It states that its letter determinations required the cities to pass through to their customers what was effectively a reduction in the cities' cost of purchased power, just as the PPACs passed through the cost increases. The PSC emphasizes that if the cities may retain the refunds received from WPS, then the cities may apply the refunds

---

[7] The cities also challenged the right of the PSC to make the determinations more than ninety days after the FPC's final approval. The circuit court held that the 90-day provision was directory only. The cities do not argue that issue on this appeal.

to operating expenses unrelated to the cost of purchased power and the cities would therefore receive retroactive rate increases and retroactively increased rates of return. The PSC contends that hearings should not be held to determine whether the cities had earnings below their authorized rates of return because the WPS refunds are unavailable to maintain those rates of return.

The PSC agrees that the PPACs partially failed in that they did not pass through to retail customers the entire amount of the increased purchased power costs and agrees that adjustments should be made accordingly but states that such adjustments can be made by the PSC staff members without a public hearing. The PSC takes no position in its brief regarding the cost to the cities in procuring the WPS refunds through intervention before the FPC.

Subject to constitutional considerations, the establishment of rates is a legislative function. *Waukesha Gas & E. Co. v. Railroad Comm.*, 181 Wis. 281, 287, 194 N.W. 846 (1923). The general rate-making power of the PSC is to "determine and by order fix reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and followed *in the future. . ."* Sec. 196.37(1), Stats., emphasis added. In the absence of statutory authority, the PSC has no power to fix rates to be applied retroactively. *Friends of Earth v. Public Service Commission*, 78 Wis.2d 388, 411, 254 N.W.2d 299 (1977); *Wisconsin Telephone Co. v. Public Service Comm.*, 232 Wis. 274, 303, 287 N.W. 122, 287 N.W. 593 (1939); *Milwaukee v. West Allis*, 217 Wis. 614, 620, 258 N.W. 851, 259 N.W. 724 (1935).

*Friends of Earth* held that the PSC may grant interim rate relief after a hearing through an order conditioned upon a refund should the PSC determine in its final order that the interim rate was excessive. *Friends of*

*Earth* held that the general rule against retroactive rate-making is not violated by this procedure because the PSC does not fully exercise its rate-making power until the interim rate is re-evaluated in the final order.

Implicit in the holding of *Friends of Earth* is the reason for granting interim rate relief: to protect a rate of return.[8] The court noted the severe problem of regulatory lag in a period of rising costs between the utility's application for a rate change and the agency's final action. 78 Wis.2d at 402. It found reasonable the PSC's past practice in interim rate proceedings "to limit the inquiry in that proceeding primarily to ascertaining the existence and amount of the utility's immediate revenue needs and to defer most other matters for resolution in the final order." 78 Wis.2d at 408, 409. The order appealed in *Friends of Earth* was an interim order and the PSC's determinations in its final order (which was judicially noticed) differed from the interim order in several respects. 78 Wis.2d 407, 408. The court held that re-evaluation of the interim order in the final order, where the power to re-evaluate has been retained in the interim order, does not constitute retroactive rate-making even though the PSC has retained "the power to issue an order *relating back to the interim order* for purposes of such re-evaluation." 78 Wis.2d at 413, emphasis added.

It is therefore now settled that the PSC may, after a hearing, grant a utility an interim rate increase for one reason and reduce that rate increase for other reasons in its final order, as of the date of its interim order.

[8] The interim order in *Friends of Earth* is not fully set forth in the opinion. Appellant's appendix in that appeal shows that the PSC reviewed the utility's projected 1975 operating results at its existing rates to determine the rate of return on estimated average net investment rate base and on common stock equity capital and concluded, "Extraordinary remedies are necessary in this proceeding to improve return. Thus interim relief as requested is necessary."

The interim orders issued in the cities' applications follow the PSC's past practice which *Friends of Earth* approved. Purchased power cost increases endangered the cities' earnings. The PSC, after public hearings, authorized the cities to adjust their rates to meet the increased cost of purchased power but reserved the right to require by final order refunds to retail customers should the final wholesale rates "result in excessive earnings." The term "excessive earnings" can be understood only to mean that the difference between operating revenues and operating expenses, net operating income, is too high a rate of return, as variously determined and controlled by the PSC. (See statement of PSC in the Two Rivers order, footnote 5.) This is consistent with the 1972 order of the PSC which permitted Eagle River to retain a WPS refund to shore up its rate of return.

Requiring disbursement of a refund by final order is of course opposite in effect from permitting a utility to retain it. The PSC's retained power to elect either alternative is nevertheless the same in both instances: to adjust by final order as of the date of the interim order the utility's net operating income and therefore its rate of return.

The PSC's adjustment or re-evaluation of its interim order when entering its final order must necessarily somehow dispose of the refund paid to the utility by its electric power wholesaler. No matter how the PSC orders the utility to handle that refund, whether distribution or retention, it is impossible to avoid some degree of limited but controlled retroactivity.

The rule against retroactive rate-making, however, is not violated in either event because the interim order was conditional and the PSC will not have "fully exercised

its rate-making power" until it re-evaluates its interim order when issuing its final order. *Friends of Earth,* 78 Wis.2d at 412, 413.

Strict control is exercised by the PSC to protect the public interest at each critical juncture, the date the interim order is issued and the date the final order is issued. The re-evaluation process is subject to public scrutiny because the final order may be entered only after an investigation and hearing as part of the rate-making process before the PSC, as required by sec. 196.20(2), Stats., or on reopening as authorized by sec. 196.39, Stats. And, as held in *Friends of Earth,* judicial review of the PSC's action on the interim order may be had upon judicial review of the final order so as to protect the interests of the ratepayer. 78 Wis.2d at 411.

The circuit court held that sec. 196.645, Stats., authorizes the PSC to permit retention of the refund if the utilities operated by the cities do not have excessive earnings. We agree with the PSC that the statute does not do so. Section 196.645, Stats., provides,

REDUCTION IN RATES; RETROACTIVE EFFECT. If the rates of any public utility shall be based upon the cost of any energy, commodity or service furnished to said utility which is in turn furnished or distributed by said utility to the public served by it, and the charges for which are regulated by any authority of the federal government, and such charges are changed by such federal authority, the commission upon complaint or upon its own motion may proceed to investigate and determine whether the utility's rates shall be changed by reason of the change in the cost of energy, commodity or service resulting from the change in charges as prescribed by such federal authority; and any such change in rates by the commission may be made effective as of the effective date of the order of the federal authority prescribing such change in charges. In any such case, notwithstanding the provisions of sections 196.62 and 196.63, the commission may determine and require payment by the utility to its customers of any sums which it may have received from

them subsequent to such effective date of its said order in excess of the rates so prescribed by the commission.

The cities, as operators of public utilities, come within sec. 196.645, Stats. Their rates are "based upon the cost of" power purchased by them and "in return furnished or distributed by said utility to the public served by it, and the charges for which are regulated by" a federal agency, the FPC. The words "based upon the cost" mean that the rates are primarily based upon such cost, for the statute contemplates that the utility furnishes or distributes that which it has purchased to the public served by it. The cost of purchased power constitutes 75% to 85% of the cities' total costs. Distribution costs are inevitably incurred but are far less significant factors in determining the utility's rates.

Section 196.645, Stats., authorizes the PSC, however, only to make changes in the utility's rates "resulting from the change in charges as prescribed by such federal authority." In the case before us, the utility's authorized rates will not be changed. The effective rate will be changed through the re-evaluation process but that change will be justified by the presence or absence of excessive earnings as determined by the PSC, not by "the change in charges as prescribed by such federal authority." Section 196.645, Stats., does not authorize the use of an excessive earnings test to determine whether the refund is to be distributed or retained.

The necessity of a hearing distinguishes the possible retention of a PPAC refund from the "expanded adjustment clause" condemned in *Wis. Environmental Decade v. Public Service Comm.*, 81 Wis.2d 344, 260 N.W.2d 712 (1978). The PSC authorized a utility in that case to apply a clause which allowed it to pass on to its customers, automatically and without further hearing, increases in costs to the utility of items listed in the clause such as

purchased power, fuel, labor, supplies, steam, electrical expenses and supervision. The court held that expanded adjustment clauses are not authorized because the statutory scheme of regulation does not envisage a rate change without a public hearing.

The procedure approved in *Friends of Earth* and mandated by this court on the interim orders before us avoids the inherent defect of an expanded adjustment clause. No increase of the effective rate occurs without a hearing as to the effect of retention or distribution of the refund upon the utility's earnings.

■

The PSC has agreed that the cities are entitled to deductions from refunds ordered for amounts not actually collected from retail customers due to failures of the PPACs. Deductions should also be made for the cities' reasonable costs in obtaining the refunds through intervention. It is fair to infer that the favorable settlement effected by the cities with WPS was due at least in part to the cities' efforts. If the consumers are to enjoy rate refunds obtained through those efforts, they should share the reasonable cost of success.

■

The circuit court construed the cities' application to the PSC for reconsideration and rehearing of the letter determinations as the equivalent of application for retroactive adjustment of their rates in effect during the period for which WPS made its refunds. That construction was appropriate to the court's interpretation of sec. 196.645, Stats. The cities' application for rehearing and reconsideration, in our view, should have been granted for the purpose of re-evaluating each interim order in the same proceeding in which it was granted by final order or otherwise after a public hearing.

*By the Court.*—The judgment of the circuit court reversing the determination made by letters of the PSC to

each petitioner dated July 12, 1976, as to the amount of refund received and to be refunded to each petitioner's customers, is affirmed but modified so as to remand the matter to the PSC for further proceedings consistent with this opinion.