[No. 47986-1. En Banc. June 23, 1983.]

EARLE M. JORGENSEN COMPANY, ET AL, *Appellants,*
v. THE CITY OF SEATTLE, *Respondent.*

*Edmund J. Wood, Cartano, Botzer, Larson & Birkholz, J. Jeffrey Dudley, Bogle & Gates,* and *Elaine Spencer,* for appellants.

*Douglas N. Jewett, City Attorney,* and *William H. Patton* and *Ricardo Cruz, Assistants,* for respondent.

UTTER, J.—This is a challenge of Seattle's 1980 adoption of an electrical rate increase. We reject appellants' various constitutional and statutory claims and affirm the trial court's order of summary judgment.

Appellants sought to set aside the electrical rates set by respondent City of Seattle (City) on July 21, 1980. Appellants are 19 industrial companies and one individual who purchase electricity from the City, located both within and without the Seattle city limits. The new rates increased the cost of electricity to 15 of the appellants by an average 88 percent.

In May 1978, the City, responding to an increase in power costs, formed a Citizens' Rate Advisory Committee (CRAC), which included representatives of appellants, to prepare recommendations concerning rate setting. The CRAC had 60 full committee meetings between May 1978 and July 31, 1980, in furtherance of its role in advising the City on electrical rate structure.

On April 23, 1980, Mayor Charles Royer submitted to the City Council an allocation proposal calling for roughly equal rate increases for all consumer classes. The City Council energy committee scheduled a public hearing for May 14 to obtain comments on this proposal.

On April 29 and May 5, the energy committee held public hearings to discuss electric rate assistance policies, finance policies, and Seattle City Light's revenue requirements. For these as well as other public hearings held by the Council, notice was sent to 1,000 interested parties and was published in the local newspapers.

On May 13, the day before the rate allocation public hearing, Mayor Royer submitted a new allocation proposal calling for increases of 35 percent for residential users, 27 percent for commercial users, and 82 percent for industrial users. Although various people protested at the May 14 hearing that they had had insufficient time to comment intelligently on the new proposal, no further hearings on the allocation formula were held. Instead, members of the energy committee held private meetings and informal

"working sessions" with various people, including representatives of appellants, to discuss the allocation model. On June 9, the City Council approved the allocation model.

Meanwhile, on May 27, 1980, Mayor Royer had submitted to the Council a rate design proposal. A public hearing on this proposal was held on June 10. On June 20, a new rate design proposal was submitted by Seattle City Light at the request of Council member Randy Revelle, chairman of the energy committee. A deadline for comments on this proposal was set for June 27. Again, some of the appellants protested the short time allowed for comments and requested the opportunity to call and to cross-examine witnesses. No such opportunity was provided. The rates were subsequently further revised up to the day of final passage. They were finally passed by the Council as ordinance 109218 on July 21, 1980.

Appellants brought suit to have the rates set aside and for a refund of payments. They alleged: (1) the rates were unfair, unjust, and unreasonable in violation of RCW 80.28.010; (2) appellants had been denied due process; (3) appellants had been denied the rights to intervene and participate in the rate proceedings provided by the Public Utility Regulatory Policies Act (PURPA); and (4) the rates were unlawfully made retroactively effective. The court granted partial summary judgment for the City on claims 2 and 3. It found no just reason for delay and ordered immediate entry of judgment on these claims. That is the judgment challenged in this appeal.

On December 16, 1981, the trial court entered judgment in favor of the City on the claims that were not resolved through the court's earlier order of partial summary judgment. The court held the City did not act arbitrarily or capriciously in enacting ordinance 109218, that the rates were not unfair, unjust or unreasonable, and that the methodology employed by the City in establishing the rate increase was not fundamentally erroneous. Apparently, neither party plans to appeal this judgment.

## I

Appellants first raise a number of claims founded upon a due process interest in meaningful participation in the setting of electric rates. The kind of process which renders participation meaningful depends on the kind of decision being made. Thus, appellants' due process claims ultimately depend on whether we characterize the Seattle City Council's decisionmaking process in setting electrical rates as legislative or administrative (and if administrative—whether its function is legislative or adjudicative).

Appellants urge us to adopt a functional analysis of whether the Council's action is legislative or administrative. We have embraced this functional approach in the past, *Westside Hilltop Survival Comm. v. King Cy.,* 96 Wn.2d 171, 634 P.2d 862 (1981), and are not bound by who makes the decision (*e.g.,* a legislative body) or the form the decision takes (*e.g.,* ordinance) in determining the decision's character.

In arguing the setting of electrical rates is administrative, appellants rely on case law dealing with whether certain matters are subject to referendum. *See, e.g., Leonard v. Bothell,* 87 Wn.2d 847, 557 P.2d 1306 (1976). All these cases in turn rely on 5 E. McQuillin, *Municipal Corporations* § 16.55 (3d ed. 1969) which identifies the factors by which to distinguish legislative from administrative acts in this context:

> Actions relating to subjects of a permanent and general character are usually regarded as legislative, and those providing for subjects of a temporary and special character are regarded as administrative. . . .
>
> The test of what is a legislative and what is an administrative proposition, with respect to the initiative or referendum, has further been said to be whether the proposition is one to make new law or to execute law already in existence. The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.

(Footnote omitted.) Appellants also point to the apparent anomaly of *State ex rel. Haas v. Pomeroy,* 50 Wn.2d 23, 308 P.2d 684 (1957), a referendum case in which the City's bond council argued and the court found convincing (though it did not rely on) the position that the City's rate setting powers are administrative.

There are two problems with appellants' reliance on the referenda case law. First, analysis of the legislative/administrative distinction with respect to powers of referenda is not the same analysis relevant to the procedural safeguards that must inhere in administrative as opposed to legislative action. When a court determines that an action is administrative and thus not subject to referendum, it does not hold such administrative action is subject to greater procedural safeguards than acts subject to referendum. Quite the contrary, courts deny referenda with respect to administrative acts because of the broad discretion attached to such acts.

■ We rely on a more germane body of case law, which specifically holds a municipality's setting of rates is a legislative act. *Springfield Gas & Elec. Co. v. Springfield,* 257 U.S. 66, 70, 66 L. Ed. 131, 42 S. Ct. 24 (1921); *Connett v. Jerseyville,* 110 F.2d 1015 (7th Cir. 1940); *Algoma v. Public Serv. Comm'n,* 91 Wis. 2d 252, 283 N.W.2d 261 (1978); *Apartment & Office Bldg. Ass'n v. District of Columbia,* 415 A.2d 797 (D.C. App. 1980); *Fort Collins Motor Homes, Inc. v. Fort Collins,* 30 Colo. App. 445, 496 P.2d 1074 (1972); C. Rhyne, *Local Government Operations* § 23.14 (1980); 12 E. McQuillin, *Municipal Corporations* § 35.37 (Supp. 1981). Courts have found no contradiction in finding such acts legislative yet not subject to the referendum process. *In re Initiative Petitions,* 534 P.2d 3 (Okla 1975); *Aurora v. Zwerdlinger,* 194 Colo. 192, 571 P.2d 1074 (1977). We, too, have held the setting of rates is a legislative act. *Scott Paper Co. v. Anacortes,* 90 Wn.2d 19, 28, 578 P.2d 1292 (1978).

Appellants' second problem is that they wrongly assimilate "administrative" with "quasi-judicial." While administrative adjudications require many procedural safeguards,

the same is not true with respect to administrative policy-making functions. Appellants concede some aspects of rate setting involve policymaking, but they claim the revenue allocation among customer classes and the design of the actual rates are adversarial processes, which, though stemming from legislative authority, should be characterized as quasi judicial. While it is true the setting of electrical rates involves weighing individual factors, it can hardly be said, as it can be in the rezoning context, that the final decision is for A and against B. Both A's and B's interests must be considered in rendering the final balance, but the ultimate consideration of the Council is what balance of *all* the rate-payers' interests best serves the community. All legislative acts may be subdivided into a series of adversarial contests, but that does not make such acts quasi judicial. *See Harris v. Hornbaker,* 98 Wn.2d 650, 658 P.2d 1219 (1983). If we were to characterize rate setting as quasi judicial, it would be so not only for ratepayers with the highest costs, but for all ratepayers. Every ratepayer would be entitled to notice and the procedural safeguards that accompany quasi–judicial decisions.

While ratemaking may have an administrative aspect, even under a functional analysis, that aspect is not quasi judicial. We have consistently held rate setting is a legislative act, even with respect to rate allocation and design. *See Phinney Bay Water Dist. v. Bremerton,* 58 Wn.2d 298, 362 P.2d 358 (1961); *Faxe v. Grandview,* 48 Wn.2d 342, 294 P.2d 402 (1956).

This conclusion dispenses with appellants' broadest due process claims. The appearance of fairness doctrine, under any interpretation we have given it, applies only in a quasi–judicial context. The right of cross examination, a component of that doctrine, is similarly applicable only in a quasi–judicial context.

Appellants' remaining due process claims relate to failure of notice and an opportunity to comment. Generally, we have not imposed procedural requirements upon legislative decisions. In reviewing ratemaking decisions of legislative

bodies, we have looked only to whether the rates were fair (*i.e.,* reasonable, nondiscriminatory, not arbitrary or capricious). *See Faxe v. Grandview, supra; Phinney Bay Water Dist. v. Bremerton, supra.*

One of the reasons for such judicial deference is the public accountability of elected officials. *Snohomish Cy. PUD 1 v. Broadview Television Co.,* 91 Wn.2d 3, 9, 586 P.2d 851 (1978). Appellants argue such deference should be abandoned as to nonresident ratepayers who were denied a meaningful opportunity to participate in the ratemaking process. At least as to them, the City Council is not accountable through the electoral process. Nonetheless, we have held in a similar context that nonresidents' constitutional rights were not violated by delegation of legislative authority to set water rates to a city council when such delegation occurred with sufficient procedural safeguards. *King Cy. Water Dist. 54 v. King Cy. Boundary Review Bd.,* 87 Wn.2d 536, 546, 554 P.2d 1060 (1976). Implicitly, the court's holding on unlawful delegation included a finding of procedural due process to nonresidents.

Since ratemaking is a legislative act, appellants' only due process right is in nonarbitrary rates. The City has prevailed on that issue in a separate action. To the extent there is any merit to providing procedural safeguards to insure the City's rate setting is not arbitrary, the question is more appropriately discussed under appellants' next claim addressing unlawful delegation.

## II

RCW 35.92.050 grants municipalities "full authority" to regulate the price of power sold by them. Municipal utilities are exempted from the control of the Utilities and Transportation Commission. RCW 80.04.500. Appellants assert that this delegation of rate–setting authority is improper insofar as it does not provide for sufficient procedural protections. This argument is based on *Barry & Barry, Inc. v. Department of Motor Vehicles,* 81 Wn.2d 155, 159, 500 P.2d 540 (1972) in which this court held that

legislative power may be delegated to administrative agencies only where "*procedural safeguards exist to control arbitrary administrative action and any administrative abuse of discretionary power.*"

Respondent argues it is not subject to the *Barry* delegation standard since ratemaking is a legislative act and the delegation doctrine applies to administrative bodies. Respondent is correct in asserting that our unlawful delegation doctrine has usually been applied in the context of legislative delegation to nonelective administrative bodies. The City Council is an elected body and the setting of electric rates is a local concern. As a leading commentator has stated:

> The general doctrine prohibiting the delegation of legislative authority does not preclude the legislature from vesting municipal corporations with certain powers as to matters purely of local concern.

2 E. McQuillin, *Municipal Corporations* § 4.13, at 33 (3d ed. 1979).

> The fixing of rates to be charged by a lighting plant owned and operated by the municipality has been held a "municipal function," within the meaning of such words as used in this constitutional provision.

2 E. McQuillin, § 4.11, at 27.

 Nonetheless, the unlawful delegation doctrine has been applied to legislative delegation of its powers to elected officials, *Yelle v. Bishop,* 55 Wn.2d 286, 347 P.2d 1081 (1959) (delegation to Governor), and to local legislative bodies. *See Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963) (city council authorized to determine existence of blighted areas under urban renewal laws); *King Cy. Water Dist. 54 v. King Cy. Boundary Review Bd., supra* (city council delegated power to set water rates). The Seattle City Council is an elected body but it still serves as the agent of the Legislature in setting electrical rates. In *King Cy. Water Dist.* we indicated the city council was an agent of the Legislature in setting water rates and was subject to the delegation doctrine, at least insofar as its deci-

sions affected nonresidents. Yet the character of the decision was the same as to residents and nonresidents. That the decisionmaking body is elective as to most of those its rate–setting decision affects is simply one of the factors to weigh in determining if adequate procedural safeguards exist for the delegation of legislative power.

In *King Cy. Water Dist.*, the court found adequate procedural safeguards for delegation. Those safeguards consisted of: (1) statutory standards for water rates; (2) comprehensive regulation of water system financing by RCW 35.92.070 *et seq.*; (3) judicial power to set aside discriminatory, arbitrary, and unreasonable rates; and (4) the right of nonresidents to "attend and participate in public meetings of the city council. RCW 35.24.180." 87 Wn.2d at 546.

Appellants argue that since RCW 35.92.050 (authorizing the City to set electric rates) provides no procedural safeguards, it is unconstitutional. Appellants' focus is too narrow. Procedural safeguards need not inhere in the statute itself. If the statutory delegation provides inadequate guidelines, the procedural safeguards may be provided by the administrative body. *See Yakima Cy. Clean Air Auth. v. Glascam Builders, Inc.*, 85 Wn.2d 255, 534 P.2d 33 (1975); *State ex rel. Standard Mining & Dev. Corp. v. Auburn*, 82 Wn.2d 321, 510 P.2d 647 (1973); *Barry & Barry, Inc. v. Department of Motor Vehicles, supra*; K. Davis, *Administrative Law* § 3:3 (Supp. 1981).

Looking at the entire decisionmaking process, we must conclude adequate procedural safeguards exist. Just as there must be uniformity of standards for water rates under RCW 35.92.010, so must electrical rates be just and reasonable and nondiscriminatory under RCW 80.28.090, .100. The comprehensive regulation of financing under RCW 35.92.070 applies equally to water and electric utilities. As with water rates, courts may set aside arbitrary or discriminatory electrical rates. Furthermore, notice must be provided for public meetings of the City Council under Seattle City Charter, art. 4, § 6. The public's right to participate is

no greater under RCW 35.24.180 (regarding water rates) than under the City's charter. In addition to these comparable procedural safeguards, the City created CRAC, which met 60 times in its advisory capacity. Some of appellants were represented on CRAC. Finally, the Congress has imposed other procedural safeguards through PURPA, including evidentiary hearings, which the City must comply with in its own ratemaking process. Taken as a whole, considerable safeguards are provided. We conclude the delegation of RCW 35.92.050 is lawful.

### III

Appellants next claim they were denied a right to "intervene and participate" pursuant to 16 U.S.C. § 2631(a) (Supp. 2, 1978). That section provides:

> In order to initiate and participate in the consideration of one or more of the standards established by subchapter II of this chapter or other concepts which contribute to the achievement of the purposes of this chapter . . . any electric consumer of an affected electric utility may intervene and participate as a matter of right in any ratemaking proceeding or other appropriate regulatory proceeding relating to rates or rate design which is conducted by . . . a nonregulated electric utility.

The City is a "nonregulated electric utility." Subchapter 2 specifies standards that utilities are required to consider in rate setting, although not necessarily to implement. Subchapter 2 also requires hearings on certain specific subjects which provide for notice, consent and findings. Such hearings were conducted by the City.

The City argues section 2631's right to intervene is limited to the hearings it was required to hold under subchapter 2 and in which appellants chose not to participate. However, the House Conference Report on this section indicates:

> [T]his section creates a Federal right of participation and intervention in rate–making proceedings or other appropriate regulatory proceedings conducted by . . . a nonregulated electric utility. . . .
> . . . The conferees intend for the term intervention to

be interpreted broadly to include intervention or participation at the beginning of a proceeding or otherwise but do not intend for such term to connote a right to initiate a proceeding.

The conferees intend that the phrase "other concepts which contribute to the achievement of the purposes of this title" be construed broadly so that no one will have to prove his case in advance before being allowed to intervene. Any issue which may contribute to the purposes of the title should be given consideration if it may contribute to these purposes.

H.R. Rep. No. 1750, 95th Cong., 2d Sess. 81–82, *reprinted in* 1978 U.S. Code Cong. & Ad. News 7797, 7815–16. The legislative history thus indicates the right of intervention and participation exists in *any* proceeding.

■ At the same time, the conferees noted, at page 7816, "The procedures for the type of intervention are left to State law", thus leaving the plenary right of intervention limited by the nature of participation afforded under the City's ratemaking procedures. We do not interpret PURPA's right of intervention as a right that confers a full panoply of adjudicative safeguards. Nor do we feel the United States Supreme Court's recent opinion upholding the statute against constitutional attack, *Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 72 L. Ed. 2d 532, 102 S. Ct. 2126 (1982), supports appellants' broad interpretation of their intervention and participation rights under section 2631. The Court upheld both PURPA's substantive requirement that utilities "consider" various ratemaking standards and "certain notice and comment procedures when acting on [those] federal standards." 456 U.S. at 770. While finding the notice and comment procedures more intrusive than the federal mandate to "consider" the proposed standards, the Court nevertheless held, at page 771:

If Congress can require a state administrative body to consider proposed regulations as a condition to its continued involvement in a pre–emptible field—and we hold today that it can—there is nothing unconstitutional

about Congress' requiring certain procedural minima as that body goes about undertaking its tasks.

The notice and comment procedures to which the Court referred are the specific procedures for notice, hearing and findings under sections 2621 and 2623 of the act, as well as the evidentiary hearings required by the act. *See* 16 U.S.C. § 2624(b) (Supp. 2, 1978). The City complied with these provisions. In accordance with section 2624, the City held an evidentiary hearing on lifeline rates on April 15, 1980. On April 29 and May 5, the City held public hearings in accordance with section 2621 to consider the section's proposed standards. And on September 22, 1980, the City held a public hearing pursuant to section 2623 with respect to adoption of certain other federal standards. Appellants did not participate in any of these procedures.

If section 2631 had been meant to confer adjudicatory safeguards in *any* proceeding of the ratemaking authority concerning *any* subject, the United States Supreme Court would have been obliged to address such usurpation of state law in that portion of its opinion. It did not, nor is there any indication the Court felt section 2631 transformed the nature of every ratemaking proceeding of a nonregulated utility. Such a disruptive right would not facilitate PURPA's purposes.[1] The City complied with the specific procedural requirements of sections 2621, 2623 and 2624. It provided notice and public hearings and published its findings with respect to consideration and adoption of specific federal standards, and it held evidentiary hearings where required. Appellants' right of intervention and participation in all other proceedings of the Council were limited by the mode of participation provided by the City.

---

[1]The entire Court (including Justice Powell in concurrence and Justice O'Connor in dissent) discussed section 2631's right of intervention as relating only to ratemaking proceedings in which the federal standards are considered. No members of the Court interpreted the right to participate in proceedings considering "other concepts" as synonymous with an in terrorem right to turn any ratemaking proceeding into an adjudication of any ratepayer's particular agenda.

## IV

Finally, appellants argue the City's ratemaking is rulemaking under the Seattle Administrative Code 3.02. Seattle Municipal Code (SMC) 3.02.020(A) states:

A. "Agency" means The City of Seattle or any of its subdivisions including but not limited to, any city board, commission, committee, officer or department, including the City Council and its committees, when acting in accordance with or pursuant to authorization by ordinance or Charter to make rules, hear appeals, or adjudicate contested cases.

The code defines "rule" as

any agency order, directive, or regulation of future effect, including amendment or repeal of a prior rule, which applies generally and which, if violated, subjects a person to a penalty or administrative sanction, including, but not limited to, an order, directive, or regulation which affects:

. . .

4. Any qualification or requirement relating to the enjoyment of benefits of privileges conferred by law.

SMC 3.02.020(E). The City Council is subject to the City's administrative code and the provision defining "rule" is both broad and nonexhaustive. We might easily include the setting of electrical rates within the Council's rulemaking capacity since those rates have "future effect." But then so does most everything the Council does in its legislative capacity. It is simply because the definition of "rule" is so sweeping that we must place commonsense limits on it. Setting rates in the form of an ordinance does not exempt it from the City's administrative code, but we do not feel the City intended such ordinance to be an "order, directive or regulation" constituting a rule under the code. Nor do we feel the determination of electric rates is a "penalty or administrative sanction." Finally, even if rate setting were a rule within the code, the City would have been empowered to limit public participation to written presentations. Appellants seek more. Neither the City's administrative code nor the other bases proffered by appellants affords

them what they seek.

The trial court's order of summary judgment is affirmed.

STAFFORD, BRACHTENBACH, DOLLIVER, DIMMICK, and PEARSON, JJ., concur.

ROSELLINI, J. (dissenting)—The majority holds that the procedures afforded the public in this case are adequate to protect their interests in electric rate setting. Although I agree with the constitutional and statutory analysis contained in parts I and II of its opinion, I cannot agree with the majority's conclusions concerning the application of the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 2631 (Supp. 2, 1978) or the Seattle Administrative Code 3.02. I therefore dissent.

As recognized by the majority, PURPA grants any electric consumer the right to intervene and participate in ratemaking proceedings. 16 U.S.C. § 2631(a). The majority asserts, however, that this right is limited to participation in the consideration of which standards utilities are required to consider in rate setting rather than participation in the actual ratemaking proceeding. I disagree. Such a result is consistent with neither the clear language of PURPA nor the legislative purpose behind its enactment. A close examination of the section relied upon by the majority demonstrates this fact. Section 2631(a) states:

> In order to initiate and participate in the consideration of one or more of the standards established by subchapter II of this chapter *or other concepts which contribute to the achievement of the purposes of this chapter*, . . . any electric consumer of an affected electric utility may intervene and participate as a matter of right in *any* ratemaking proceeding or other appropriate regulatory proceeding relating to rates or rate design which is conducted by . . . a nonregulated electric utility.

(Italics mine.)

The majority's interpretation of this section focuses on the first part of clause 1, *i.e.,* "in the consideration of one or more of the standards established by subchapter II of this

chapter". But in doing so it ignores language in the second half of that clause. That language grants the right to participate in the consideration of "other concepts which contribute to the achievement of the purposes of this chapter". This language sweeps more broadly than suggested by the majority. When that phrase is recognized and read in light of the section's later reference to a right to "intervene and participate as a matter of right in *any* ratemaking proceeding", the opposite conclusion must be reached. (Italics mine.) The majority also relies upon *Federal Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 72 L. Ed. 2d 532, 102 S. Ct. 2126 (1982) as authority for the proposition that the phrase "any ratemaking proceeding" means selective ratemaking proceedings. The majority contends that the United States Supreme Court would have had to address the issue of usurpation of state law if the section were so read. The majority's reasoning assumes that the court would reach an issue that was not directly before the court. Such an assumption is unsound. In addition, the PURPA's grant of intervention would survive constitutional challenge because the extent of that intervention is defined by state law. Because the majority misinterprets this section, its reliance is misplaced. For instance, the majority quotes the House Conference Report's statement that "'[t]he procedures for the type of intervention are left to State law'". Majority opinion, at 872 (quoting H.R. Rep. No. 1750, 95th Cong., 2d Sess. 81–82, *reprinted in* 1978 U.S. Code Cong. & Ad. News 7797, 7816). The majority takes this deference to state law and equates it with deference to the City's procedures. Consequently, the majority declares "the plenary right of intervention [is] limited by the nature of participation afforded under the City's ratemaking procedures", (majority opinion, at 872) and "[a]ppellants' right of intervention and participation in all other proceedings of the Council were limited by the mode of participation provided by the City." Majority opinion, at 873. Such a result is an absurd leap in reasoning. Deference

to state law means just that, state law. Nothing in PURPA justifies the majority's substitution of City of Seattle law for state law. To vest the right to determine the degree of intervention and participation with the utility or its municipal owner is to let the wolf guard the sheep. Neither section 2631(a) nor *Federal Energy Regulatory Comm'n v. Mississippi, supra,* justifies the majority's analysis.

Lastly, the limited right of intervention and participation contemplated by the majority neglects legislative history that clearly establishes that this section should be interpreted broadly. The section quoted by the majority demonstrates this point. See majority opinion, at 871–72.

Having established that the right of intervention is to be determined by state law, the next question is what state law? I suggest the best resolution lies in this court requiring that the City of Seattle follow its administrative code in these proceedings. Such a result is consistent both with present state law and the goals of PURPA. The majority admits the Seattle Administrative Code could easily be interpreted to apply to the case at hand but implicitly asserts that such an interpretation exceeds the common-sense limits. I disagree.

Setting of electrical rates is the precise type of "regulation of future effect" which lends itself to the protections of the Seattle Administrative Code. If we as a court were to find ratemaking is a rule under the administrative code, ratepayers would be entitled to notice and a hearing on the adoption of the rates, instead of the limited notice and opportunity to comment allowed by the City in this case. This result would insure ratepayers notice and an opportunity to comment on the City's *final* rate design. This opportunity was denied by the City's last minute substitution of a new rate scheme, proposed hours before the public meeting.

Finally, by making the City's decision subject to hearing and comment under the administrative code, the court

would have established a basis for participation which is more consistent with the procedural rights granted in PURPA. I would therefore reverse summary judgment and require the City of Seattle to conform to its own administrative code when engaging in the ratemaking process.

WILLIAMS, C.J., and DORE, J., concur with ROSELLINI, J.