

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CITY OF BELLEVUE, | ) | NO. 73646-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| GREENSUN GROUP, LLC, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: June 13, 2016 |

LAU, J. — This case involves a lawsuit between Greensun Group LLC and the city of Bellevue (the City) over Greensun's attempt to open a recreational marijuana store in downtown Bellevue after voters passed Initiative 502. Greensun appeals the summary judgment order dismissing its claims against the City. Because the denial of a business license is not a land use decision subject to the Land Use Petition Act's (LUPA) statute of limitations and the City failed to adopt its first in time rule according to mandatory rule making procedures, we reverse the trial court's order granting the City's summary judgment and remand for further proceedings consistent with this opinion.

## FACTS[1]

### Marijuana Statute

In 2012, Washington voters passed Washington Initiative Measure No. 502 ("I-502"). This initiative decriminalized marijuana possession for limited amounts and created a system for the licensed production, distribution, and sale of recreational marijuana. All recreational marijuana distributors must be "validly licensed" and maintain compliance with "rules adopted by the state liquor and cannabis board." RCW 69.50.360. An applicant for each license type is required to disclose the location for the proposed business.

I-502 directed the Washington Liquor Control Board (LCB) to create rules governing commercial marijuana. LCB set the number of permissible retail marijuana licenses in King County at 61. It allocated four licenses to the city of Bellevue. See Bellevue Ordinance No. 6156.

In October 2013, Bellevue adopted Ordinance No. 6133 B-1, an emergency interim zoning provision. This ordinance imposed temporary restrictions on marijuana producers, processors, and retailers to "mitigate the negative impacts arising from operation of recreational marijuana uses." Clerk's Papers (CP) at 80.

In April 2014, the City extended the emergency ordinance for six months under Ordinance No. 6156. The ordinance also imposed a location restriction: "[n]o marijuana retailer shall be located within 1,000 feet of any other marijuana retailer." CP at 82.

---

[1] The parties are familiar with the facts. We address them only briefly.

Greensun Group LLC

In late 2012, Greensun's two member-managers, Seth Simpson and David Ahl, leased retail space in downtown Bellevue in anticipation of I-502's voter approval. Greensun modified the building for use as a medical marijuana store until it obtained a recreational retail license.

The City later required Greensun to obtain a building permit for these upgrades. In January 2013, Simpson submitted a permit application.

In April 2014, the LCB announced a lottery system to award the four marijuana retail licenses among potential applicants. It also explained that after lottery winners were selected, "[t]he initial retail licenses will issued [sic] in batches (10-20) in the most populous areas." CP at 95.

On May 2, LCB announced Par 4 as one of the lottery winners. Par 4's application showed its planned retail store was within 1,000 feet of Greensun's retail space.

The City denied Greensun's marijuana retail business license because it was not a lottery winner.

On May 7, City Associate Planner Reilly Pittman, notified retailers, including Par 4 and Greensun, that marijuana retailers can "lock down" a location for purposes of the 1,000 foot rule by submitting a completed building permit application. CP at 403. Pittman told Greensun its building permit application did not satisfy the "lock down" rule because Greensun was not a lottery winner. CP at 356-57.

On June 5, Greensun was named a lottery winner when an original winner was disqualified.

On June 11, Pittman notified Par 4 its location was "locked down." CP at 416.

For reasons not clear in our record, the City abandoned the building permit "lock down" rule. Development Services Department (DSD) legal planner Catherine Drews announced a new "first in time" rule to resolve conflicts among stores located within 1,000 feet of each other. Drews' June 24 letter also informed applicants that LCB's conditional approval letters would serve as a 30-day marijuana license and its issuance date determines which entity is first in time.

> In the event two or more retail marijuana applicants seek licensing from the LCB and are located within 1000 feet of another potential retail applicant, the City shall consider the entity that is licensed first by the LCB to be the "first-in-time" applicant. Based on information obtained from the LCB, if LCB approves your application, you will receive an electronic billing statement requesting payment of the $1,000 licensing fee. Once the LCB receives this fee, the City understands that LCB will send you a conditional approval letter that serves as your 30-day marijuana license until you receive your business license with the marijuana endorsement from the Washington State Department of Revenue Business Licensing Service. The issuance date for the letter serving as your 30-day marijuana license will determine which entity is first-in-time in terms of how the City applies the 1000 foot separation requirement for retail outlets.[2]

CP at 115-16 (emphasis added).

On July 7, LCB issued marijuana licenses via e-mailed letters all dated July 7 to the four lottery winners including Par 4 and Greensun.[3] As soon as Greensun received its license, Simpson applied for a business license. The City refused to issue the

---

[2] Drews apparently did not know that LCB issued the licenses "in batches" even though this information was available at the time to the public.

[3] Par 4 received three different versions of the LCB license on July 7. The first license was incorrectly dated July 3. The final version of the license sent to Par 4 on July 7 corrected this mistake and indicated an issuance date of July 7. Par 4 agrees July 3 is an erroneous date because it received the e-mailed letter on July 7.

license and claimed Par 4 was first in time. Greensun disagreed, pointing to the same July 7 date on the license issued to it and Par 4.

Assistant City Attorney Chad Barnes contacted LCB Assistant Attorney General Kim O'Neal. She said no means existed to determine which license was issued first in time under the LCB's system. Barnes explained the problem to Par 4 and Greensun in a letter.

> The LCB issued a letter to [Par 4][4] on July 3, 2014, which appears to grant [Par 4] a retail license; however, Greensun claims that the letter was issued in error. We have spoken with Assistant Attorney General Kim O'Neal who has informed us that the LCB currently takes the position that the July 3, 2014 letter received by [Par 4] was not the actual marijuana retail license despite the language contained in the letter. <u>O'Neal stated that the actual licenses were issued following the July 7, 2014 online notice to both your clients. We asked Ms. O'Neal if the LCB had any way to determine which entity was actually first issued a marijuana license, and she indicated that their system was not set up for such a query.</u>

CP at 195-96 (emphasis added).

Barnes continued to investigate. He found a state licensing website that showed Par 4's license was approved on July 6 and Greensun's was approved on July 7.

On July 29, the City denied Greensun's business license. Barnes explained, "the entity that is licensed first by the [LCB] will be considered 'first-in-time' at a particular location." He further explained LCB's July 3, 2014 letter "approving an entity's license and serving as the temporary operating permit"[5] was the "determinative factor" for establishing which entity was first in time. CP at 236. Barnes said that Par 4 was first in

---

[4] Although the parties used trade names in their application materials, we refer to the parties as "Greensun" and "Par 4" for clarity.

[5] The LCB marijuana license letter also served as the entities' temporary operating permit. For clarity, we refer to the LCB letter as "license," in this opinion.

time because it received a marijuana license and LCB never revoked the July 3 letter granting Par 4 the license.

> The City's decision is based on the fact that on July 3, 2014, the LCB sent [Par 4] a letter indicating it was approving [Par 4]'s marijuana retailer license and directed that the letter be posted as [Par 4]'s temporary operating permit.[6] The LCB subsequently sent [Par 4] a revised temporary operating permit on July 7, 2014 at 1:08 pm.
>
> In contrast, the LCB did not inform [Greensun] that its retail marijuana license had been approved until a similar letter was issued at 3:04 pm on July 7, 2014. Consequently, [Par 4] was approved at its proposed location before [Greensun]. Although [Greensun] has asserted the July 3, 2014, letter sent to [Par 4] was done so in error by the LCB, the City is not aware of any actions taken by the LCB to revoke the July 3, 2014 letter. Regardless, the revised temporary operating permit letter sent to [Par 4] on July 7, 2014, precedes the letter sent to [Greensun].

CP at 236. Barnes also explained, "LCB's records indicated [Par 4]'s license was approved on July 6, 2014. [Greensun] was not approved until July 7, 2014." CP at 237. July 6 falls on a Sunday. Attached to his letter were internet printouts from a website entitled "Statewide Recently Approved Licenses." CP at 238.

Rebecca Smith, LCB Director of Licensing and Regulations for liquor and marijuana, explained the LCB's licensing process in her deposition. Smith testified that Par 4's initial license dated July 3 was "an error" because "we didn't issue any licenses before [July 7]." CP at 578, 581. She said that no licenses were actually issued on July 6, a Sunday. She further testified that the website Barnes relied on for the July 6

---

[6] Even after learning from O'Neal that actual licenses were all issued on July 7, Barnes' letter incorrectly states that the LCB sent Par 4 the license on July 3, 2014. Par 4 received the e-mail from LCB representative Elizabeth Lehman on July 7, 2014.

approval date was not an official LCB website. "I believe this belongs to Licensing Resources. It's not the Liquor Control Board."[7] CP at 377.

On November 3, 2014, Greensun sued the City, alleging due process violations, arbitrary and capricious action, and requested declaratory and injunctive relief on enforcement of the 1,000 foot ordinance.

The City moved for summary judgment, arguing Greensun's claims failed on their merits and were time-barred under LUPA.

Greensun voluntarily withdrew its facial challenge to the City's 1,000 foot ordinance and cross-moved for summary judgement.

On May 20, 2015, the trial court granted summary judgment for the City and dismissed Greensun's lawsuit. It denied Greensun's motion for reconsideration.

Greensun appeals.

## ANALYSIS

Greensun argues the City (1) failed to follow mandatory rule making procedures, (2) violated its fundamental right to conduct business under Article I, § 12 of the Washington Constitution, and (3) applied the first in time rule in an arbitrary and capricious manner.

### Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. When reviewing an

---

[7] Smith's sworn testimony arguably undermines Barnes' reliance on dates he used to determine first in time as between Par 4 and Greensun for the purposes of the 1,000 foot rule. We note that Barnes' reliance on questionable dates and times differs from the first in time rule announced by Drews in her June 24 letter. There, Drews used the licenses' "issuance date" as the first in time rule.

order for summary judgment, an appellate court engages in the same inquiry as the trial court. James v. County of Kitsap, 154 Wn.2d 574, 580, 115 P.3d 286 (2005). We review questions of law de novo. James, 154 Wn.2d at 580.

LUPA Statute of Limitations[8]

The City argues that Greensun's claim is barred by LUPA's 21-day statute of limitations. RCW 36.70C.040(3). The parties agree we review this as a question of law.

LUPA's purpose is to effectuate "uniform, expedited appeal procedures and uniform criteria for reviewing such decisions, in order to provide consistent, predictable, and timely judicial review" of land use decisions. RCW 36.70C.010. LUPA sets out a "21-day deadline for appealing the final decisions of local land use authorities and is intended to prevent parties from delaying judicial review at the conclusion of the local administrative process." Habitat Watch v. Skagit County, 155 Wn.2d 397, 406, 120 P.3d 56 (2005). Where it applies, LUPA provides the "exclusive means of judicial review" of a land use decision. RCW 36.70C.030. The parties dispute whether the City's decision to deny Greensun's business license is a land use decision subject to LUPA's statute of limitations.

Whether a given action constitutes a "land use decision" subject to LUPA's 21-day statute of limitations is governed by statute:

> (2) "Land use decision" means a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals, on:

> (a) An application for a project permit or other governmental approval required by law before real property may be improved, developed,

---

[8] We note the trial court did not expressly rule on the LUPA time bar question. We assume the trial court rejected the time bar claim when it granted the City's summary judgment. Since both sides briefed it, we address it.

modified, sold, transferred, or used, but excluding applications for permits or approvals to use, vacate, or transfer streets, parks, and similar types of public property; excluding applications for legislative approvals such as area-wide rezones and annexations; and excluding applications for business licenses.

(b) An interpretive or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property; and

(c) The enforcement by a local jurisdiction of ordinances regulating the improvement, development, modification, maintenance, or use of real property. However, when a local jurisdiction is required by law to enforce the ordinances in a court of limited jurisdiction, a petition may not be brought under this chapter.

RCW 36.70C.020(2) (emphasis added).

The City argues that Chad Barnes' July 29 letter denying Greensun's business license is either an "interpretive" or "enforcement" decision under section (2)(b) or (2)(c), above. It claims "the record is clear that the City properly made its land use decision prior to denying Greensun's business license." Br. of Resp't at 28.

We look to the statute's plain language in order to fulfill our obligation to give effect to legislative intent. Lacey Nursing Ctr., Inc. v. Dep't of Revenue, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). When faced with an unambiguous statute, we derive the legislature's intent from the plain language alone. Waste Management of Seattle, Inc. v. Utilities and Transp. Comm'n, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994).

Section (2)(a)'s plain language quoted above expressly excludes business license applications from the land use decision definition. Barnes' July 29 letter to Greensun states that "[t]he City will not grant [Greensun] a business license to operate a retail marijuana outlet at 10600 Main Street based on the separation requirement in Ordinance 6156." CP at 237 (emphasis added). The record shows the City's denial

decision was based on Greensun's business license application. The City's brief does not address section (2)(a)'s business license application exception.

But even if we assume the City's decision is either an "interpretive" or "enforcement" decision, land use decisions are defined as a "final determination by a jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals. . ." RCW 36.70C.020(2). Under the Bellevue City Code (BCC), the official with the highest level of authority to make a land use decision is the DSD Director. LUC 20.40.100. Barnes is a Bellevue Assistant City Attorney, and his July 29 letter was written in anticipation of litigation. Indeed, this letter closes with the City's threat to "take legal actions . . . including seeking a restraining order" if Greensun persisted in trying to operate a retail marijuana outlet. Barnes is not the director or an official vested "with authority to hear appeals." RCW 36.70C.020(2)(c). The City's brief fails to address this dispositive question.

The City relies on Asche v. Bloomquist, 132 Wn. App. 784, 791, 801, 133 P.3d 475 (2006), and Brotherton v. Jefferson County, 160 Wn. App. 699, 249 P.3d 666 (2011), to argue LUPA bars Greensun's claims. These cases are unpersuasive. Unlike here, neither case involved the business license application exception.

Judicial review under LUPA is expressly limited to final "land use decisions" as defined by the statute. Because business license applications are explicitly excluded from the definition of "land use decisions," LUPA's statute of limitations does not apply to bar Greensun's claims.

### Failure to Follow Rule Making Procedure

The core issue here is whether the City's first in time method is a "rule" and thus subject to rule making procedures under LUC 20.40.100.[9] Greensun argues the first in time rule is invalid because it was never adopted under the city code's rule making procedures. We agree.

Statutory construction is a question of law we review de novo. Belleau Woods II, LLC v. City of Bellingham, 150 Wn. App. 228, 240, 208 P.3d 5 (2009). "The court's fundamental objective is to ascertain and carry out the intent of the legislative body." Belleau Woods II, LLC, 150 Wn. App. at 240. "If the language of the statute is plain, that ends the court's role." Belleau Woods II, LLC, 150 Wn. App. at 240.

The BCC codifies several common law rules of statutory construction. For instance, the code applies the ordinary meaning to words and terms unless technical words or phrases are used.

> All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in the law shall be construed and understood according to such peculiar and appropriate meaning.

BCC 1.04.040(B). Undefined terms "shall be construed according to the context and approved usage of the language." BCC 1.04.040(D). And "[t]he provisions of the ordinances of the city, and all proceedings under them, are to be construed with a view to effect their objects and to promote justice." BCC 1.04.040(A).

---

[9] Neither the City's summary judgment brief or brief on appeal address this issue.

Responsibility for administration of the Bellevue City Land Use Code (LUC) rests with the director. The LUC governs the director's rule making discretion, and prescribes certain formal rule making procedures:

> The Director shall be responsible for the administration of this title. The Director <u>may</u> adopt rules for the implementation of this title; <u>provided</u>, the Director shall first hold a public hearing. The Director shall publish notice of intent to adopt any rule, and the date, time and place of the public hearing thereon in a newspaper of general circulation in the City at least 14 days prior to the hearing date. Any person may submit written comment to the Director in response to such notice, and any person may speak at the public hearing. Following the public hearing, the Director shall adopt, adopt with modifications, or reject the proposed rule.

LUC 20.40.100 (emphasis added).

The trial court ruled this provision grants discretion to the director to adopt rules without formal rule making:

> Plaintiff challenges the lack of a formal process in establishing the method to determine first in time. <u>There does not appear to be a requirement under Bellevue City Code for the Director to promulgate formal rules. The code is permissive. The Director may promulgate rules.</u> The director also has the authority to coordinate with the business license process under the code.

CP at 710 (emphasis added).

Greensun acknowledges the director is not required to adopt rules under LUC 20.40.100's plain language. But Greensun argues this provision requires the director to follow certain rule making procedures whenever it adopts a rule. Greensun contends the City's first in time method is a formal rule that triggers the code's rule making procedures. Thus, we first consider whether the first in time method is a "rule." If so, we must then consider whether rule making is required under BCC 20.40.100.

-12-

Nowhere in the BCC is the term "rule" defined. The City could have defined the term "rule" to narrow the actions within its scope. For example, under the Seattle Municipal Code (SMC):

> "Rule" means any agency order, directive, or regulation of future effect, including amendment or repeal of a prior rule, which applies generally and which, if violated, subjects a person to a penalty or administrative sanction, including, but not limited to, an order, directive, or regulation which affects:
> 1. Any procedure, practice or requirement relating to agency hearings;
> 2. Any qualification or standards for the issuance, suspension or revocation of licenses;
> 3. Any mandatory standards for any product or material which must be met before distribution or sale; or
> 4. Any qualification or requirement relating to the enjoyment or benefit or privileges conferred by law.
>
> Such term does not include statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public, declaratory rulings issued pursuant to Section 3.02.080, or rules relating to the use of public ways and property when substance of such rules is indicated to the public by means of signs or signals.

SMC 3.02.020(E).

Since "rule" is undefined, we turn to BCC 1.04.040. Undefined terms "shall be construed and understood according to the common and approved usage of the language," except that "technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in the law shall be construed and understood according to such peculiar and appropriate meaning." BCC 1.04.040(B).

Whether we use the common or technical meaning, the first in time method is a "rule" for purposes of rule making under the code. The standard dictionary defines "rule" as "a prescribed, suggested, or self-imposed guide for conduct or action: a regulation or principle" or "a regulation or bylaw governing procedure in a public or private body (as a legislature or club) or controlling the conduct of its members." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1986 (2002).

-13-

A legal dictionary defines the term as "an established and authoritative standard or principle; a general norm mandating or guiding conduct or action in a given type of situation." BLACK'S LAW DICTIONARY 1529 (10th ed. 2014).

The City's first in time rule satisfies both the common and technical definition of the term "rule." It is a guide, regulation, or principle that governs the City's procedure for siting marijuana retail stores now and in the future.[10]

Greensun cites the state and federal APA statutes as persuasive authority. We are not persuaded. The APA does not apply to municipalities. And unlike here, the APA expressly defines the term "rule."

The City argues for common sense limits on the broad definition of "rule," citing Earl M. Jorgensen Co. v. City of Seattle, 99 Wn.2d 861, 665 P.2d 1328 (1983). The Supreme Court, there, considered whether rate making by the Seattle City Council was a "rule" as defined by the city's municipal code. The court explained, "[w]e might easily include the setting of electrical rates within the Council's rule making capacity since those rates have 'future effect.' But then so does most everything the Council does in its legislative capacity." Earl M. Jorgensen Co., 99 Wn.2d at 874. Because the definition of "rule" was so "sweeping," the court concluded the application of "commonsense limits" was appropriate. Earl M. Jorgensen Co., 99 Wn.2d at 874. Jorgensen is not persuasive. As discussed above, BCC 1.04.040(B) controls where, as

---

[10] The record shows that Drews "sent a letter to all participants in the LCB lottery advising the participants to familiarize themselves with the separation requirements in the City's ordinances and stating that '[i]n the event two or more retail marijuana applicants seek licensing from the LCB and are located within 1000 feet of another potential retail applicant, the City shall consider the entity that is licensed first by the LCB to be the "first-in-time" applicant.'" CP at 115 (emphasis added).

here, a term is not defined. Unlike here, the SMC provides an express definition for the term "rule" as quoted above. Our conclusion is consistent with the intent of the Bellevue City Code and our duty to construe the provisions of the code "with a view to effect their objects and to promote justice." BCC 1.04.040(A).[11]

We next address whether formal rule making was required. LUC 20.40.100 states that the director "may adopt" rules. Under the City code definition, "'[m]ay' is permissive." BCC 1.04.010(F). The code plainly authorizes but does not require the director to adopt formal rules.

But where the director elects to adopt a rule, the code is equally clear the director "shall" follow LUC 20.40.100's rule making procedures. Under LUC 20.40.100, the director "may adopt rules . . . provided, the Director shall first hold a public hearing," and "shall publish notice of intent to adopt any rule . . ." LUC 20.40.100 (emphasis added). "Shall" is mandatory. BCC 1.04.010(H).

The trial court ignored the proviso language that limits the director's rule adoption discretion. "Provisos operate as limitations upon or exceptions to the general terms of

---

[11] The City's failure to notice the LCB's public announcement that "initial retail licenses will issued [sic] in batches (10-20) in most populous areas" (included Par 4 and Greensun) triggered a series of ad hoc City decisions intended to implement its unworkable first in time rule. As Drews later described it, "we did not issue a written policy about [the "lock down" rule.] We didn't publish it. We had to make decisions on the fly and—Well, that's probably not a good way to say it." CP at 630. The City's assistant attorney acknowledged licenses were issued in batches and LCB's system was not set up to "determine which entity was actually first in time." CP at 195. Even the ultimate first in time winner, Par 4, complained to the City about its "illogical first in time rule":

> The City's pursuit and reliance on the State's actual license 'issuance order' is illogical and a waste of time for all parties involved where those records likely do not exist.

CP at 198.

-15-

the statute to which they are appended and as such, generally should be strictly construed with any doubt to be resolved in favor of the general provisions, rather than the exceptions." Washington State Legislature v. Lowry, 131 Wn.2d 309, 327, 931 P.2d 885 (1997). Properly read in context, the rule adoption language permits the director to decide whether or not to "adopt rules for the implementation" of the land use code. But the proviso language limits this discretion by requiring formal rule making procedures to adopt a rule.

The director's failure to adopt the first in time rule under the City's rule making procedures renders the first in time rule and related decisions invalid.

The City relies on Hama Hama Co. v. Shorelines Hr'gs Bd., 85 Wn.2d 441, 448, 536 P.2d 157 (1975), to argue the first in time rule was a valid attempt to "fill in the gaps" of the 1,000 foot ordinance. In some cases, an agency charged with the enforcement of an ambiguous statute is authorized to "fill in the gaps" to implement a general statutory scheme, provided the "agency does not purport to 'amend' the statute."[12] Hama Hama, 85 Wn.2d at 448; Northshore Investors, LLC v. City of Tacoma, 174 Wn. App. 678, 697 n.5, 301 P.3d 1049 (2013) (deferring to clerk's consistently applied interpretation of city ordinance the clerk was charged with enforcing). This "gap filling" principle applies only where a statute is ambiguous. Hama Hama, 85 Wn.2d at 448. Ordinance 6156 states that "[n]o marijuana retailer shall be located within 1,000

_____

[12] The City cites Hama Hama for the proposition that it has authority to "fill in the gaps." Br. of Respondent at 34. The City omits that this principle only applies where the statute is ambiguous. Hama Hama, 85 Wn.2d at 448. Furthermore, an "agency does not have the power to promulgate or change legislative enactments but it may fill in the gaps in legislation where necessary to effectuate a general statutory scheme." In re Dependency of D.F.-M., 157 Wn. App. 179, 193 n.45, 236 P.3d 961 (2010).

feet of any other marijuana retailer." CP at 82. Ambiguity occurs where language is susceptible to two or more reasonable interpretations. Cerillo v. Esparza, 158 Wn.2d 194, 201, 142 P.3d 155 (2006). The 1000 foot ordinance contains no ambiguity and the City points to none.

Under the unique circumstances here, LUC 20.40.100's rule making procedures apply to the City's first in time rule. Because the City's first in time decisions were made without rule making, the rule and these decisions must be invalidated.[13] Hillis v. State, Dep't of Ecology, 131 Wn.2d 373, 400, 932 P.2d 139 (1997) ("Ecology's decisions, made without rule making, must be invalidated.").

Attorney Fees

The City requests attorney fees. Under RCW 4.84.370, the Washington Supreme Court has held that a public entity is entitled to fees if its land use decision is upheld on the merits at the trial court and on appeal. Durland v. San Juan County, 182 Wn.2d 55, 78, 340 P.3d 191 (2014). Because the City has not prevailed, we decline its request for fees and costs.

---

[13] Given our disposition in this opinion, we decline to address the more troubling claim by Greensun that the questionable first in time decision here constitutes arbitrary and capricious action by the City. Bridle Trails Community Club v. City of Bellevue, 45 Wn. App. 248, 724 P.2d 1110 (1986) (addressing freestanding arbitrary and capricious claim raised against the city).

## CONCLUSION

For the reasons discussed above, the City's first in time rule and related decisions must be invalidated. We reverse the trial court's order granting the City's summary judgment and remand for further proceedings consistent with this opinion.[14]

WE CONCUR:

---

[14] Given our resolution here, we need not address Greensun's remaining contentions.